19494

CAROLINA HOME BUILDERS, INC., Respondent, v.
ARMSTRONG FURNACE COMPANY, Appellant

(191 S. E. (2d) 774)

348

*William Douglas Gray, Esq.,* of *Watkins, Vandiver, Kirven, Long & Gable,* Anderson, *for Appellant,*

350

*Karl L. Kenyon, Esq.,* of *Anderson, Kenyon & Epps,* Anderson, *for Respondent,*

*William Douglas Gray, Esq,* of *Watkins, Vandiver, Kirven, Long & Gable,* Anderson, *for Appellant, in Reply.*

October 3, 1972.

BRAILSFORD, Justice:

In the fall of 1968, Carolina Home Builders, Incorporated, purchased from a Greenville distributor, Sun Heating Company, heating and cooling equipment for use in an apartment complex under construction by it in Anderson. The equipment, consisting of twenty-four identical electric furnaces and like numbers of identical condensers and evaporators, was selected and ordered by Carolina from a variety of models described in the specification sheet and price list of the defendant, Armstrong Furnace Company, whose products Sun Heating distributed. The seventy-two units were shipped from Armstrong's factory to Ohio Sun Heating in Greenville. Mechanics employed by Carolina installed a furnace and an evaporator in an upstairs closet in each of twenty-four new apartments, the condensers being installed elsewhere.

The twenty-four heating and cooling systems were identical in operation. A single fan, housed in the furnace, served both the furnace and the evaporator. To accommodate this dual function, the furnance was mounted directly atop the evaporator in the closet. When used as a part of the air conditioning systems, the fan propelled air downwardly through the evaporator assembly in what is styled as a "counterflow" or "downflow" application.

When installation began, it was found that the furnaces did not match the evaporators for mounting purposes. Thereupon, a representative of Sun Heating contrived the needed number of "transition pieces," not otherwise described in the record, with the use of which Carolina's mechanics were able to fasten the furnaces into place on the evaporators.

Following installation, a test of the air conditioning systems revealed that each unit was discharging condensation onto the closet floor beneath the evaporator. Instead of flow-

ing down the aluminum fins of the V-shaped cooling coil inside the evaporator, thence into the drain pan at the base of the coil, much of the condensation forming on the fins during normal operation dropped off the fins and onto the floor.

After consultations between Carolina's president, Sun Heating's representative and Armstrong's chief engineer, auxiliary drain pans were finally installed which substantially solved the problem, although their use somewhat reduced the cooling efficiency of the system. By the time the problem was solved, however, aberrant condensation from the units in use by tenants in the rented apartments had caused extensive water damage to floors, ceilings and walls. This action by Carolina against Armstrong and Sun Heating for water damage and loss of rental income attributed to the faulty functioning of the air conditioners followed.

The complaint was in a single count. Preliminarily, it alleged that the heating and cooling equipment had been warranted by Armstrong to be of the highest quality of material and workmanship and to be free of defect, but that the evaporators were defective in that the condensation of water which formed during the cooling operation was not contained by the drip pans and drains designed for that purpose. Instead, the condensation saturated the floors and caused water damage to the buildings, which, in turn, resulted in loss of tenants and rents.

The complaint then alleged that plaintiff's damages were the result of joint and concurrent negligence and willfulness of the defendants, as specified as to Sun Heating in ten sub-paragraphs and as to Armstrong in eight sub-paragraphs. Actual and punitive damages were sought. Armstrong interposed a general denial to the complaint. Sun Heating was dismissed from the action at plaintiff's election prior to the trial and its answer was not printed. .

The jury found a verdict for plaintiff for actual damages, the claim to punitive damages having been withdrawn, and defendant has appealed on numerous exceptions.

The first ground of appeal charges error in the refusal of Armstrong's motion for a directed verdict for lack of any evidence of actionable negligence on its part. Armstrong's chief engineer testified that discharge of condensation from the fins, short of its intended destination in the drain pan, was the inevitable result of the use of this model evaporator in conjunction with the electric furnace, a purpose for which, he tesified, it was not designed. Even at minimum speed, the furnace fan supplies a volume of air to the evaporator considerably in excess of that which it is designed to accommodate. The excessive velocity of the resulting airflow was assigned by this witness as the main cause of improper condensation discharge, described as "blow-off." His testimony at the trial was Carolina's first notice of Armstrong's claim that the units were mismatched.

If Armstrong in fact marketed the furnace and evaporator models in question for use in combination, we think it reasonable to conclude that it was negligent in failing to design the evaporator to accommodate the volume of air supplied to it by the furnace fan, and in failing to discover this defect by ordinary testing. The specification sheet and price list furnished by Armstrong to Sun Heating, and used to select the equipment, were placed in evidence. The price list specifies the use of cooling equipment of two tons capacity in combination with the electric furnace. The evaporator model chosen met that requirement. Beneath a picture of the electric furnace the price list declares: "OUR STANDARD COOLING IS APPLICABLE ON THIS SERIES." The specification sheet, used in conjunction with the price list, contains a "Furnace and Evaporator Application Chart." In the case of oil and gas furnaces, the chart specifies the evaporator models whose cabinets "match" each furnace, and also designates those evaporators which are "not recommended for use with furnace." Although the chart indicates that the cabinet of an evaporator model larger than the one purchased by respondent matches the electric furnace for counterflow application, it fails to advise against

the use of any particular models, as is done with the other furnaces. Additionally, various "transition kits" are recommended for use in adapting certain evaporators to match various oil and gas furnaces, thus implying that a mismatch between furnace and evaporator cabinet does not necessarily preclude their use in combination.

When Armstrong undertook to distribute information designating satisfactory combinations of equipment, upon which purchasers were intended to rely in selection, it assumed the duty to use care in assuring an appropriate choice. Assuming, as Armstrong claims, that the furnace and evaporator models purchased by respondent were not designed for use together, the jury could reasonably conclude that Armstrong inadequately informed the buying public of that fact. Moreover, when Armstrong received a single order from Sun Heating for twenty-four furnaces, condensers and evaporators, it was surely on notice that use of the units in combination was contemplated. The jury could reasonably conclude that filling this order without inquiry or warning amounted to negligently marketing the mismatched units for such use.

An additional ground of defendant's motion for a directed verdict was based upon the absence of privity of contract between Carolina and Armstrong. In assigning as error the refusal of the circuit court to sustain this ground, Armstrong's reliance is upon the discredited doctrine of *Winterbottom v. Wright,* 10 Mees & W 109, 152 English Reprint 402 (1842), and its progeny, proscribing a negligence action against the manufacturer of a defective product in the absence of privity of contract between the defendant and the injured party. The so-called general rule of non-liability resulted in hardship, and the courts were astute in fashioning exceptions by which, after many years, it has been subverted. Much has been written by judges and law writers about this assault upon the citadel of privity, which

need not be expounded here.* In joining the unmistakable thrust of modern authority by holding that the manufacturer or other supplier of a defective and harm-producing chattel is accountable to the injured party on ordinary negligence principals, regardless of lack of contractual relations with such party, we content ourselves with a few key citations. See *Carter v. Yardley & Co.,* 319 Mass. 92, 64 N. E. (2d) 693 (1946); *Smith v. Atco Co.,* 6 Wis (2d) 371, 94 N. W. (2d) 697 (1959); *Corprew v. Geigy Chemical Corporation,* 271 N. C. 485, 157 S. E. (2d) 98 (1967); The Assault Upon The Citadel, 69 Yale Law Journal 1099 (1960); The Fall of The Citadel, 50 Minn. Law Review 791 (1966); Prosser on Torts, Sec. 96, p. 643 (4th ed. 1971).

Carolina's president, on cross-examination, estimated ■■ that twenty-five of thirty tenants who moved from the apartments during the period of unsatisfactory air conditioner operation had done so on that account. He based this estimate on personal communications made to him by irate tenants. The witness also testified, without objection, concerning the rate of vacancy and consequent loss of rentals during this period. Armstrong subsequently moved to strike all the testimony concerning lost rentals as conjecture and surmise, and assigns the refusal of this motion as error. A motion to strike evidence admitted without objection is addressed to the sound discretion of the court. *Lindsey v. City of Greenville,* 247 S. C. 232, 146 S. E. (2d) 863 (1966), and cases cited therein. We find no abuse of discretion on the trial judge's ruling, especially since the motion came after lengthy cross-examination of the witness on this subject.

Respondent's president also testified without object-■■ ion that structural damage to the apartments had resulted from the condensation spillage. He further

---

* Actually, we overturn no precedent by our decision today. We have never had occasion to adopt the privity-shield rule in negligence cases, although we have recognized its existence in applying exceptions to it. *Delk v. Liggett & Myers Tobacco Co.,* 180 S. C. 436, 186 S. E. 383 (1936); *Salladin v. Tellis,* 247 S. C. 267, 146 S. E. (2d) 875 (1966).

testified, again without objection, to the installed cost of the furnaces and air conditioners. At the completion of all the evidence, Armstrong moved "for a directed verdict as to all damages which occurred subsequent to the discovery of the water problem" and also moved for a directed verdict as to the cost of the units as an element of damage. The refusal of these motions is assigned as error. A defendant's motion for directed verdict, however, goes to the entire case and may be granted only when the evidence raises no issue for the jury as to defendant's liability. Appellant's motion for a directed verdict as to claimed elements of damages is unknown to our practice, inappropriate, and was properly overruled. *Wilson v. Glock*, 252 S. C. 309, 166 S. E. (2d) 207 (1969). Armstrong took no exception to the court's instructions to the jury on the subject of damages, and no issue thereabout is involved here.

Armstrong assigns as error the allowance by the court of a number of Carolina's requested instructions upon the common ground that "these matters were not in issue at the close of the testimony due to the Plaintiff's failure to produce any evidence as to those matters." In our disposition of these questions, we are concerned only with whether the instructions violate the principal that the charge should be limited to the issues raised by the evidence. The correctness of the instructions in other respects is not challenged, and we assume it.

The jury was instructed that a manufacturer "is charged with a duty to keep abreast and aware of current standards and scientific knowledge in his industry. He is held to the skill of an expert in his business, and to an expert's knowledge of the materials and processes in his industry." A mechanical engineer testified that the design of the evaporator was defective, and that he knew of no other manufacturer who employed a V-shaped evaporator coil at the time Armstrong fabricated the units in question. Armstrong's chief engineer testified otherwise, thereby creating a factual issue as to the soundness of the Armstrong

design and its conformity to industry practice current at the time of manufacture. The instruction was not foreign to the evidence.

The court instructed the jury that an implied warranty arises if the manufacturer who sells the product knows "the particular purpose for which the goods are required and that the buyer is relying on its skill or judgment to select or furnish suitable goods . . ." Appellant, not having excepted to the instruction at the trial upon the ground that there was no evidence of the existence of such knowledge, may not raise the point for the first time on appeal.

The jury was instructed that a manufacturer "has a duty to give adequate or accurate instructions on the use of the product, and failure to do so is negligence." The thrust of appellant's defense was improper use. Reasonably construed, the quoted instruction was relevant to the claimed inadequacy of the specification sheet and price list from which the components were ordered.

The trial judge charged that the manufacturer "has a duty to adequately warn of foreseeable and latent defects in the product (which) could result in damages to the person using the product for the purpose for which it was intended. The fulfillment of this duty is particularly necessary where there has been a representation of safety of use." Appellant assigns as error that the instruction "pertains to personal injuries occurring 'to the person' using the product," and was inappropriate since only property damage is involved. We doubt whether the jury could have been misled by the questioned phrase. The word "damages," adequately defined elsewhere in the charge, is a legal term of art encompassing loss from injury to property fully as much as personal injury. The use of the word "person" in the instruction was misplaced; but the jury could hardly have been misled, especially since the corporations involved were characterized earlier in the charge as legal persons. Appellant further complains of this instruction since no rep-

resentation of safety of use was proved. Armstrong's sales literature represented its products to be approved by various testing organizations, and its chief engineer testified that its products are represented to be of first quality. We find no prejudicial error.

The instruction on a supplier's duty to warn of "foreseeable and latent defects in the product" was followed by,

"I charge you further, that even if there is no duty to warn at the time of the sale, *facts may thereafter come to the attention of the manufacturer which make it imperative that a warning be given.*"

In colloquy over this instruction, the trial judge analogized an automobile maker's duty to recall automobiles when discovered after shipment to be defective. We find the analogy unpersuasive, however, and agree with Armstrong that this instruction was unwarranted by the facts. The only thing that came to the manufacturer's attention after the units were shipped was notice of the malfunction, which originated from Carolina. Remedial steps were in order, but warning to Carolina was not even appropriate, much less "imperative." Carolina's knowledge of the malfunction, and of the danger to its ceilings and floors from spilled condensation during the period required to remedy it, was firsthand. It simply chose to accept the risk rather than breach its leases by discontinuing operation of the air conditioners. Nothing in the evidence suggests that a different course would have been followed had Carolina been notified of the claimed mismatch of the components at the onset of the difficulty.

It is, of course, well settled that instructions should be confined to issues made by the pleadings and evidence, and an instruction which tenders an issue not so raised is error. 18 West's South Carolina Digest, Trial, Key No. 250, 251 (1952). The instruction complained of clearly violated this principle. The error was prejudicial because it permitted the jury to speculate that the damage

which occurred after the initial communication between the parties was caused by Carolina's ignorance of facts which Armstrong was dutybound to disclose.

Finally, on this phase of the argument, the jury was instructed that a manufacturer owes a duty "to conduct adequate tests and inspections on its product such as will reveal latent defects. . . ." Armstrong's claim that there was no relevant evidence is without merit. Its chief engineer testified that no operational test was made to determine whether the evaporators were capable of properly discharging their condensation.

Armstrong takes exception to instructions on the law of implied warranty assigning as error, (1) "the Plaintiff was proceeding in tort and not contract . . ."; and (2) the charge "combined an implied warranty theory and a negligence theory in violation of the well-settled principle that a Plaintiff cannot proceed on two distinct and contrasting theories of law in one case of action."

As indicated in the forepart of this opinion, the complaint in a single count contains allegations appropriate to recovery for breach of warranty and other allegation appropriate to recovery for actionable negligence. Armstrong was content to join issue and go to trial without any challenge to the complaint. There was no motion to strike and no motion to elect, not even after all of the evidence was in and the case ready for the jury. In this state of the record, we find no error as assigned in the inclusion in the instructions of both theories of recovery put forward by the complaint.

The final exception charges error in the repetition of certain instructions. This was done at the somewhat ambiguous request of the foreman of the jury. We find no error as assigned.

Reversed and remanded for a new trial.

Moss, C. J., and LEWIS, BUSSEY and LITTLEJOHN, JJ., concur.