23783

Patrick E. ROBERTS and Penny B. Roberts, Appellants v. James C. HUNTER, M.D., Kenneth H. Mincey, M.D., and Julian N. Hayes, M.D., Respondents.

(426 S.E. (2d) 797)

Supreme Court

*O. Fayrell Furr, Jr.* of *Furr and Henshaw, P.A.,* Myrtle Beach, *for appellants.*

*Robert M. Erwin, Jr., Susan C. Pardue* and *Deidre Shelton,* all of *Nelson, Mullins, Riley and Scarborough,* Myrtle Beach, *for respondents Hunter* and *Mincey.*

*Mary Ruth M. Baxter* and *John B. McCutcheon, Jr.,* both of *McCutcheon & Baxter, P.A.,* Conway, *for respondent Hayes.*

Heard Dec. 11, 1992.

Decided Feb. 1, 1993.

CHANDLER, Justice:

In this medical malpractice action, Appellants appeal a di-

rected verdict granted to Respondent Dr. Hayes and a jury verdict for Respondents Dr. Hunter and Dr. Mincey. We affirm.

## FACTS

On July 6, 1988, Appellant Patrick Roberts (Roberts) struck the left side of his neck when he fell from a scaffold. He went to the emergency room of the Grand Strand Hospital at approximately 4:00 p.m., complaining of pain in his neck and shoulder. He was examined by Dr. Hunter, the emergency room physician.

Dr. Hunter found no apparent head injury but did find abrasions on Roberts' neck. A neurological check indicated that his condition was normal.

Dr. Hunter then consulted Dr. Mincey, a vascular surgeon at the hospital. Dr. Hunter informed Dr. Mincey that, due to the location of the injury, he was concerned about the possibility of a carotid artery injury. After examining Roberts, Dr. Mincey concluded that a carotid artery injury was unlikely.

Roberts was then sent to have his shoulder and neck x-rayed. When he returned, Roberts complained of blurred vision, seeing spots in front of his eyes. An examination of Roberts' eyes revealed fairly normal vision without injury to the eye. The neurological exam was repeated and indicated no abnormalities. Dr. Hunter again consulted with Dr. Mincey, who suggested a call to Dr. Hayes, a neurologist.

Dr. Hunter then called Dr. Hayes, who was treating patients on another floor in the hospital. Dr. Hayes advised that he would come down and examine Roberts. However, Roberts left the hospital approximately fifteen to twenty minutes later, before Dr. Hayes had the opportunity to examine him.

There was conflict in the testimony concerning Roberts' discharge from the hospital. Dr. Hunter testified that he emphasized to Roberts and Roberts' wife the serious nature of the injury, advising Roberts that he should remain in the hospital for further evaluation. However, according to Dr. Hunter, Roberts refused to wait for Dr. Hayes but did agree to return to the hospital the next day.

Roberts' wife testified that Dr. Hunter never advised them about the nature or possible severity of the injuries. Rather,

they were given the option of remaining in the hospital or returning in the morning; they chose to leave.

In any event, Roberts was discharged from the hospital at approximately 7:30 p.m. At approximately 10:00 p.m., he returned to the emergency room with paralysis on the right side of his body. He was transported by emergency helicopter to the Medical University in Charleston.

Roberts commenced this action for medical malpractice against Drs. Hunter, Mincey and Hayes. The trial judge granted a directed verdict to Dr. Hayes; the jury returned verdicts for Drs. Hunter and Mincey.

## ISSUES

1. Was Dr. Hayes entitled to a directed verdict?

2. Did the jury charge include instructions which were prejudicial to Roberts?

## DISCUSSION

### A. *Directed Verdict/Dr. Hayes*

Roberts claims that a doctor/patient relationship existed with Dr. Hayes, so that Dr. Hayes had a duty to come to the emergency room immediately and his failure to do so resulted in Roberts' subsequent stroke. Accordingly, he contends the directed verdict was in error. We disagree.

■ The establishment of a doctor/patient relationship is prerequisite to a claim of medical malpractice. *Easter v. Lexington Memorial Hospital*, 303 N.C. 303, 278 S.E. (2d) 253 (1981). "The relation is a consensual one wherein the patient knowingly seeks the assistance of a physician and the physician knowingly accepts him as a patient." 61 Am. Jur. (2d) *Physicians Surgeons* § 158 at 290 (1981).

■ The issue of whether a doctor/patient relationship may exist when the patient has not been examined or treated by the doctor is novel to this Court. However, under facts similar to those here, other jurisdictions have concluded that the relationship was not established.

In *Hill by Burston v. Kokosky*, 186 Mich. App. 300, 463 N.W. (2d) 265 (1990), it was held that a treating physician's informal consultation with another physician did not give rise to a relationship: "There has been no showing that the respon-

dent [consulting physician] had any contact with the patient, saw any records relating to the case, or even knew the patient's name." 463 N.W. (2d) at 267. *See also Sullenger v. Setco Northwest,* 74 Or. App. 345, 702 P. (2d) 1139 (Or. Ct. App. 1985) (no relationship where defendant, upon entering patient's room, was asked whether he would like to manage the case and doctor declined). Similarly, in *Oliver v. Brock,* 342 So. (2d) 1 (Ala. 1977), no relationship was found when a consulting physician gave to the treating physician his opinion of the patient's condition, which opinion was relayed to the patient's mother. The court held that there was no evidence "from which it could be concluded that [consulting physician] has consented to treat the child, or any from which it could be inferred that he consented to act in a consulting capacity." 342 So. (2d) at 4.

In *Mozingo by Thomas v. Memorial Hospital,* 101 N.C.App. 578, 400 S.E. (2d) 747, *rev. den.* 329 N.C. 498, 407 S.E. (2d) 537, (1991) *aff'd* 331 N.C. 182, 415 S.E. (2d) 341 (1992), it was held that no relationship was established between an obstetrics patient and a physician who supervised the patient's treating physician. In *Mozingo,* the treating physician, a resident doctor, had called the supervising physician, reporting complications with the patient. When the supervising physician arrived at the hospital, the baby was already born with disabilities. The court held that the absence of any contact with the patient prior to the alleged malpractice negated any doctor/patient relationship.

Here, it is undisputed that Dr. Hayes neither examined Roberts nor reviewed his file. An examination was made impossible by Roberts' departure from the hospital. Based upon these circumstances, we hold that no doctor/patient relationship existed and, accordingly, directed verdict in favor of Dr. Hayes was proper. *Carolina Home Builders, Inc. v. Armstrong Furnace Co.,* 259 S.C. 346, 191 S.E. (2d) 774 (1972) (where evidence raises no issue for jury as to defendant's liability, motion for directed verdict should be granted).

### B. *Jury Charge*

Roberts contends that the trial court's charge to the jury erroneously "overemphasize[d] the limitations on the defendant's liabilities" and were "unduly exculpatory and favorable

to the defendants." He further contends that the law charged to the jury should address only the evidence produced at trial.

We agree that the law charged should address the evidence of the case. Moreover, it is well settled that jury instructions must be considered in their entirety. *Jones v. Ridgely Communications, Inc.*, 304 S.C. 452, 405 S.E. (2d) 402 (1991); *Cox v. Lund*, 286 S.C. 410, 334 S.E. (2d) 116 (1985). We have examined the charge here and conclude that, when viewed in its entirety, it fairly sets forth the applicable law of medical malpractice.

The remaining issue is affirmed pursuant to Rule 220(b)(1), SCACR.

Affirmed.

HARWELL, C.J., and FINNEY, TOAL and MOORE, JJ., concur.