2248

Michael Anthony ELLIS, Deceased, by Deborah Scott ELLIS, Personal Representative of the Estate of Michael Anthony Ellis, Appellant v. Judith Ann NILES, as Personal Representative of the Estate of Jack Niles, Jr., M.D., Respondent. Michael Anthony ELLIS, Deceased, by Deborah Scott ELLIS, Personal Representative of the Estate of Michael Anthony Ellis, Appellant v. Raymond P. BYNOE, M.D., Respondent.

(450 S.E. (2d) 631)

---

517

Court of Appeals

*Kimberly A. Raber,* Columbia, *Michael J. Miller* and *Deborah A. Vitale,* Alexandria, VA, *for appellant.*

*Ernest J. Nauful, Jr.* and *Andrew F. Lindemann,* Columbia, *for respondent Raymond P. Bynoe, M.D.*

*William L. Pope* and *Roy F. Laney,* Columbia, *for respondent Judith Ann Niles, as Personal Representative of the Estate of Jack Niles, Jr., M.D.*

Heard Sept. 9, 1994.

Decided Oct. 31, 1994; Reh. Den. Dec. 7, 1994.

HOWELL, Chief Judge:

Michael Anthony Ellis[1] filed medical malpractice actions against Dr. Jack Niles, Jr.[2] and Dr. Raymond Bynoe alleging he received negligent treatment while under the care of the Richland Memorial Trauma Team for a serious neck injury

---

[1] Ellis has since died, and this appeal is being brought by Deborah Scott Ellis as personal representative.

[2] Dr. Niles has also died, and is represented by Judith Ann Niles, as personal representative.

suffered in a traffic accident. Before the close of the plaintiff's case the court directed a verdict in favor of Drs. Niles and Bynoe. Ellis appeals. We reverse and remand.

## I.

Ellis was injured in a single-car accident the morning of October 3, 1988. The paramedics who arrived at the scene found Ellis's car upside down, with Ellis outside the car. The paramedics, assuming Ellis had suffered a spinal injury, placed a collar on him to secure his neck, and rolled him onto a spine board to maintain spinal alignment. Fully immobilized, Ellis was transported from the accident scene to Richland Memorial Hospital, a designated Level I Trauma Center. The paramedics radioed ahead to notify the trauma team of their arrival. According to Ellis, Richland Memorial thereby held itself out as providing personnel uniquely qualified in A.T.L.S., or Advanced Trauma Life Support.

There was evidence Ellis was not paralyzed at the time he arrived at the hospital. One of the paramedics noted Ellis had some movement in all four extremities. A nurse recalled Ellis was fighting and moving about on the stretcher when he first arrived, and Ellis ultimately had to be placed in arm and leg restraints. Furthermore, Dr. Weidner, a member of the Trauma team, conducted a rectal examination on Ellis when he first arrived, and noted he had rectal tone, an indication of neurological response. As of October 4, 1988, however, Ellis was paralyzed, save for the ability to move his left arm slightly.

The trauma team treating Ellis consisted of Dr. Moore, a sixth-year resident in trauma surgery, who headed the team, Dr. Pettigrew, a junior resident, Dr. Weidner, a junior resident and several nurses. Dr. Moore also called in Dr. Oliver, an anesthesiologist who was not a member of the trauma team. Dr. Oliver unsuccessfully attempted to nasotracheally intubate Ellis. Dr. Moore and Dr. Oliver then made a number of attempts to orotracheally intubate Ellis before they finally performed a cricothyroidotomy.[3] At the time they were at-

---

[3] Nasotracheal intubation is the establishment of an airway through the patient's nasal passage and down into his trachea. Orotracheal intubation is the establishment of an airway through the patient's mouth. A cricothyroidotomy is an emergency procedure whereby an airway is established through an incision in the neck directly through to the windpipe, through which a tube is then inserted into the patient's trachea.

tempting to intubate Ellis, the physicians had the cervical x-rays that revealed Ellis had sustained a spinal injury.

Dr. Bynoe was at the hospital October 3, 1988, and his name appears on an x-ray request. Dr. Bynoe did not examine or treat Ellis. However, he knew that Ellis had a cervical spine injury, and was informed by Dr. Moore by telephone that the team was about to attempt to establish an airway. Bynoe told Moore to proceed with the management of Ellis. In addition, Bynoe looked in on the team after the cricothyroidotomy had been performed. Dr. Niles was working in the emergency room on the day in question and recalled looking in on the team at various intervals. His name is reflected on the medical records, but he did not participate in the treatment of Ellis. However, Dr. Niles did see the attending physicians attempting to orotracheally intubate Ellis.

The hospital prepared a document entitled "The Trauma Team" which provides for a chain of command within the team, starting with the general surgeon/traumatologist as team leader, followed by the senior emergency department physician, the chief surgical resident, the senior surgical resident, other residents, the trauma nurses, and finally the scribe. (The most senior physician on the team treating Ellis was Dr. Moore, as chief surgical resident.) This document was apparently prepared in connection with the hospital's efforts to become certified as a Level 1 Trauma Center.

Ellis offered A.T.L.S. course materials indicating attempts at orotracheal intubation is contra-indicated for a patient suspected of having a cervical spine injury. Ellis maintains his paralysis is the result of the attempts at orotracheal intubation. Although Drs. Bynoe and Niles were not directly involved in the alleged negligent treatment, Ellis maintains they are nonetheless liable. Ellis contends that the doctors' status as A.T.L.S. specialists on the trauma team coupled with their participation (albeit limited) in Ellis's treatment is sufficient to establish a physician-patient relationship with Ellis.

In granting a directed verdict, the trial court determined there was no physician-patient relationship between Ellis and Dr. Bynoe or Dr. Niles, and therefore no duty to Ellis. On appeal, Ellis argues that the directed ver-

dict was improper because genuine questions of fact existed.[4] Ellis also challenges the exclusion of the trauma team protocol prepared by the hospital.

## II.

There are two issues of novel impression in this state that could arise from the circumstances of this case. Both of them depend for their validity on the unique situation presented by the specialized services sought to be provided by the Richland Memorial Hospital as a Level 1 Trauma Center.

The first issue is whether the relationship of physician and patient existed between Niles and Bynoe and the patient Ellis, thereby imposing a duty on them to act with reasonable care in his treatment. The trial judge correctly concluded that a duty imposed by law is a question solely for the court. *See, e.g., Rogers v. South Carolina Dept. of Mental Health,* 297 S.C. 363, 377 S.E. (2d) 125 (Ct. App. 1989). It is well-settled law that when a physician-patient relationship exists, the physician owes the patient a duty to exercise reasonable care. *Roberts v. Hunter,* — S.C. —, 426 S.E. (2d) 797 (1993). A physician-patient relationship is generally described as "a consensual one wherein the patient knowingly seeks the assistance of a physician and the physician knowingly accepts him as a patient." *Id.* at —, 426 S.E. (2d) at 799. The question here, however, is whether a physician-patient relationship can exist in the context of the unusual facts presented by this case. While no South Carolina case has specifically addressed the issue, a review of case law from other jurisdictions makes clear that the existence of a physician-patient relationship is a question of fact for the jury. *See, e.g., Walker v. Jack Eckerd Corp.,* 209 Ga. App. 517, 434 S.E. (2d) 63 (Ct. App. 1993), *cert. Denied* (1993); *Mozingo v. Pitt County Mem. Hosp., Inc.,* 101 N.C. App. 578, 400 S.E. (2d) 747 (Ct. App. 1991), *aff'd,* 331 N.C. 182, 415 S.E. (2d) 341 (1992); *Gallion v. Woytassek,* 244 Neb. 15, 504 N.W. (2d) 76 (1993); *Bienz v. Central Suffolk Hosp.,* 163 A.D. (2d) 269, 557

---

[4] Ellis also contends that the directed verdict improperly overruled a previous order denying summary judgment. This argument is without merit. Denial of summary judgement does not finally determine merits or law of the case, and issues raised in motion may be raised again in motion to reconsider summary judgment or motion for directed verdict. *Ballenger v. Bowen,* — S.C. —, 443 S.E. (2d) 379 (1994).

N.Y.S. (2d) 139 (1990); *Elliott v. State,* 630 N.E. (2d) 202 (Ind. 1994); *see also* Am. Jur. (2d) *Physicians, Surgeons, and Other Healers* § 159 (1981) (existence of physician-patient relationship is a question of fact).

The second issue, which arises whether or not a physician-patient relationship is found to exist, requires a determination of the duty of care owed by a supervising physician. Other jurisdictions have held supervising physicians liable for negligent supervision, even if the physician did not actually treat the patient. *See, e.g., Mozingo v. Pitt County Mem. Hosp., Inc.,* 331 N.C. 182, 415 S.E. (2d) (1992). In *Mozingo,* the North Carolina Supreme Court affirmed the Court of Appeals' reversal of the trial court's order of summary judgment in favor of a supervising physician. The infant plaintiff in *Mozingo* was injured during birth, allegedly the result of negligence on the part of the residents performing the delivery. The defendant doctor responsible for supervision of the residents the day in question was on call, and did not arrive at the hospital until after the child was born. The North Carolina Supreme Court recognized that health care is becoming more specialized and complex, and that patients are often treated with "teams of professionals, some of whom never actually come in contact with the treated patient but whose expertise is nevertheless vital to the treatment and recovery of patients." *Id.* at 189, 415 S.E. (2d) at 345. The court therefore held that a physician "who undertakes to provide on-call supervision of residents actually treating a patient may be held accountable to that patient, if the physician negligently supervises those residents and such negligent supervision proximately causes the patient's injuries." *Id.* The fact that the defendant and patient "did not fit traditional notions of the doctor-patient relationship" did not change the defendant's duty to exercise reasonable care in supervising the resident. *Id.* at 188, 415 S.E. (2d) at 345. Here, as the highest-ranking members of the trauma team, Bynoe and Niles apparently had supervisory responsibilities over the other members of the team. Therefore, Bynoe and Niles arguably had a duty to supervise the team's treatment of Ellis.

Unfortunately, however, neither issue is presented to this Court with sufficient factual development for us to make a determination, because the trial court, on its own motion, di-

rected a verdict before Ellis presented all of his evidence.[5] Given the novel issues presented by this case, Ellis was at least entitled to present his entire case. Instead, just before Ellis called his expert, the trial court *sua sponte* dispensed with further testimony and began a colloquy with the attorneys that resulted in proposed stipulations and disclaimers of stipulations regarding what the testimony of the expert would reflect. We are left uncomfortably uncertain as to what his testimony would have been. The only thing we are certain of is that his testimony would have been directed toward the standard of care to be reasonably expected of physicians occupying the same position as Bynoe and Ellis on the trauma team. It is apparent that the testimony would not only have addressed any deviation from the expected standard of care in the actual procedure of establishing an airway for Ellis, but also the standard of care for physicians who have contracted to be a member of the trauma team. While it does not appear that negligent supervision was raised in the pleadings, it was argued at trial. The pleadings, however, were never formally amended, because the testimony was not allowed to reach a stage at which a motion to amend the pleadings to conform to the proof would have been proper. Obviously, the expert's testimony was crucial in this regard.

As discussed above, the existence of a physician-patient relationship is a question of fact. The trial court, however, believed that the existence of the relationship was a question of law. Because the trial court improperly directed the verdict against Ellis, we must reverse and remand for a new trial. Unfortunately, the trial judge did not have an adequate record upon which to make a determination of the merits of Ellis' claims, nor do we. Consequently, we cannot determine whether or not a physician-patient relationship existed, nor

---

[5] Rule 50(a), SCRCP provides that a motion for directed verdict may be made at the close of an opponent's evidence. Moreover, the rule apparently does not give a trial judge the authority to direct a verdict *sua sponte*. *Compare* Rule 19, SCrimP (specifically providing that court shall direct a verdict on motion of the defendant or *on its own motion* if there is a failure of evidence). However, we express no opinion whether, absent concrete stipulations by the plaintiff regarding the remaining testimony, or an admission that all evidence relevant to an essential element has been presented, the trial court may properly direct a verdict on its own motion before the close of the plaintiff's case in chief.

can we reach the issue of negligent supervision.[6] We express no opinion as to whether a physician-patient relationship can be established under the facts of this case, nor do we decide whether a negligent supervision claim is proper in this particular case or in malpractice cases generally. In addition, because we are remanding for a new trial, we do not reach Ellis' challenge to the exclusion of the trauma team protocol. The resolution of these issues must be made by the trial court on remand, after the facts are fully developed.

Accordingly, for the foregoing reasons, the order of the trial court is hereby reversed, and the case is remanded for a new trial.

Reversed and remanded.

SHAW and CURETON, J.J., concur.

---

[6] Typically, appellant's failure to adequately proffer evidence for the record would warrant affirmance. However, this case is far from typical. The trial court made if clear that a directed verdict was unavoidable, and that any attempt by Ellis to present more evidence would be a waste to time. While Ellis attempted to make a proffer by stipulating to the remaining evidence, the trial court refused to accept some stipulations, stating that the issue to which that testimony related was a question of law. Given that Ellis made every attempt to proffer the relevant testimony, we decline to deem the issues unpreserved.