**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

EILEEN M. HORD, individually and as
personal representative of the estate
of James A. Hord, deceased,
<u>Plaintiff-Appellee,</u>

No. 98-1541

v.

UNITED STATES OF AMERICA,
<u>Defendant-Appellant.</u>

Appeal from the United States District Court
for the District of South Carolina, at Spartanburg.
G. Ross Anderson, Jr., District Judge.
(CA-96-3401-7-13)

Argued: January 28, 1999

Decided: April 28, 1999

Before WILKINS, MOTZ, and KING, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** William George Cole, Appellate Staff, Civil Division,
UNITED STATES DEPARTMENT OF JUSTICE, Washington,
D.C., for Appellant. James B. Richardson, Jr., SVALINA, RICH-
ARDSON & LARSON, Columbia, South Carolina, for Appellee. **ON
BRIEF:** Frank W. Hunger, Assistant Attorney General, J. Rene
Josey, United States Attorney, Robert S. Greenspan, Appellate Staff,

Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. James C. Anders, JAMES C. ANDERS P.A. & ASSOCIATES, Columbia, South Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

## OPINION

PER CURIAM:

The United States of America appeals a judgment in favor of Eileen M. Hord (Appellee) on a claim she brought in her individual capacity and as personal representative of the estate of her deceased husband James Hord (Hord) under the Federal Tort Claims Act (FTCA). See 28 U.S.C.A. §§ 2671-80 (West 1994). The judgment is based on the finding of the district court that Hord's death from metastatic colon cancer was proximately caused by the negligent failure of a Veteran's Administration (VA) hospital to schedule him for a colonoscopy and other precautionary care. The United States contends that because the hospital had no duty under South Carolina law to provide such services to Hord, the United States is shielded from liability by the doctrine of sovereign immunity. The United States also argues that the district court clearly erred in finding that the failure by the hospital to give Hord the care he needed proximately caused his death. We affirm.

I.

Hord, a career officer in the Air Force, was diagnosed with appendicitis in August 1992. Surgery revealed an adenocarcinoma of the appendix, an extremely rare cancer. A second operation in which doctors removed a part of Hord's colon uncovered additional adenocarcinoma. Although Hord's doctors determined that there was a 30 to 50 percent chance that the cancer would not recur, Hord underwent chemotherapy as a precautionary measure.

2

While undergoing chemotherapy in late 1992, Hord and his family moved to Union, South Carolina, and Hord was placed on the Temporary Disability Retired List (TDRL) of the Air Force. In South Carolina, Hord's care and treatment were undertaken by Dr. James A. Bearden, a private oncologist, who continued Hord's chemotherapy until its conclusion in December 1993. At that time, clinical testing and a CT scan of Hord's abdomen and lymph nodes revealed no evidence that the cancer had recurred. Nevertheless, Dr. Bearden advised Hord that he needed to have a precautionary colonoscopy.

Hord originally inquired concerning medical care from the VA system in early 1993. He was advised at that time that he was not eligible to receive care because he had not received a service-connected rating; he was told that if he sought care at a private hospital, he would be reimbursed once he received his service-connected rating. Hord subsequently made all of the necessary applications and submitted his medical records to the VA. As a result, on June 14, 1993, his cancer of the appendix was adjudicated as service-connected, and Hord was given a 100% disability rating.[1] The United States concedes that, as a veteran with a service-connected disability, Hord was thereafter entitled to treatment from a VA hospital when he applied for it pursuant to 38 U.S.C.A. § 1710(a)(1) (West Supp. 1998). Yet, when Hord attempted to schedule an appointment at the WJB Dorn VA Hospital (the hospital) in Columbia, South Carolina, he was unable to convince hospital administrators that he was eligible for care.

Dr. Bearden recognized that Hord's need for a colonoscopy increased the importance of his ability to gain access to the VA system: Dr. Bearden knew that a colonoscopy would require hospitalization and that Hord was financially unable to pay for such hospitalization himself. Therefore, in April or May 1994, Dr. Bearden telephoned Dr. Jose Valdivieso, a gastrointestinal specialist employed by the hospital. Dr. Bearden advised Dr. Valdivieso that Hord's cancer already had been adjudicated as service-connected with a 100% disability rating and that Hord needed a precautionary colonoscopy.

_____

[1] In June 1994, approximately one year later, Hord was examined at Andrews Air Force Base by an Air Force physician regarding his TDRL status. He was found to be in remission and, as a result, was removed from the TDRL and discharged.

Dr. Bearden further conveyed to Dr. Valdivieso that he would send Dr. Valdivieso copies of Hord's medical records. Dr. Valdivieso agreed to see Hord if Hord was eligible for VA treatment (which he was), and told Dr. Bearden that he would contact him if he did not receive Hord's medical records or if he had any other problems with the referral.

Dr. Bearden's assistance proved fruitless, however. When Hord sought to make an appointment to see Dr. Valdivieso, he was told that he first needed to complete a process by which his pension rate would be determined.[2] When Hord and others acting on his behalf attempted to contact the VA after completing this process, they were advised that the hospital was very busy and he would be seen when an appointment could be scheduled. No one from the hospital ever called him, however, nor did Dr. Valdivieso follow up personally.[3]

During the fall of 1994, Hord began to experience some pain in his abdomen that he attributed to physical exertion from work. He successfully relieved the pain with an over-the-counter pain reliever. Then, in April 1995, Hord began experiencing more severe abdominal pain. He also suffered a rapid weight loss over a two-week period and, on May 14, 1995, discovered a firm mass in his abdomen. The next day, Hord went to the Salisbury, North Carolina, VA hospital emergency room. Doctors there determined that Hord had a metastatic adenocarcinoma of the colon. Hord died from the disease on December 3, 1995, at the age of 35.

Appellee brought this action against the United States pursuant to the FTCA, alleging, inter alia, that Hord's inability to receive the care

_____

[2] The United States concedes that this information was incorrect.
[3] Dr. Bearden had given Hord a copy of his medical records and told him to take them to the VA. Hord unfortunately understood this direction to mean that he should take the records to the VA Regional Center, rather than to the hospital. When he took the records to the Regional Center, they were placed in his pension file. When Dr. Valdivieso did not receive the medical records, he assumed that Hord had obtained care from another doctor and did not pursue the matter further. Dr. Valdivieso did not contact Dr. Bearden to advise him that Hord's colonoscopy had not been performed.

4

he needed from the hospital proximately caused his suffering and death from cancer. Appellee further alleged that if the United States were a private person, the negligent acts and omissions of its employees would subject it to liability under South Carolina law.

During the bench trial that ensued, the parties hotly contested whether the hospital's failure to give Hord a colonoscopy and other appropriate precautionary care proximately caused his death. Appellee presented the testimony of Dr. Bearden, who opined that the second tumor was a second "primary" tumor, that it appeared in Hord's colon, and that proper care would have detected it. According to Dr. Bearden, the second tumor grew through the wall of the colon and eventually metastasized in Hord's abdomen. Because Dr. Bearden believed that the second tumor was independent of the first, he maintained that detection of it could have prevented its metastasis into other parts of Hord's abdomen and most probably extended Hord's life significantly.

The United States, on the other hand, sought to prove that Hord died from a recurrence of his appendiceal cancer, producing evidence that at the time of Hord's 1992 operations microscopic cancer cells had already spread, or "seed[ed]," into his abdomen. J.A. 179. The United States presented evidence that recurrence of appendiceal cancer in this manner is "virtually uncurable." J.A. 146. In seeking to undercut Appellee's theory that the cancer in Hord's colon was a second primary tumor, the United States presented testimony from two pathologists who opined that the cancer had actually originated outside Hord's colon and progressed toward the inside only later.[4] The first pathologist, Dr. Russell Harley, testified that although it was possible that the second cancer originated inside Hord's colon, he believed that it began outside the colon, grew into a large mass, and only then grew inside. Dr. Saba Demian, the second pathologist, reached the same conclusion based upon microscopic slides that he had made in preparing his 1995 pathology report. Indeed, both pathologists concluded that the 1995 tumors arose from seeding of the 1992 appendiceal cancer, not from a second, primary cancer of the colon.

_____

[4] For this reason, it was the United States' position that a colonoscopy as late as 1994 would not even have revealed the cancer.

5

Following the trial, the district court imposed liability. The court found that a doctor/patient relationship was formed between Hord and Dr. Valdivieso when the VA physician accepted Dr. Bearden's referral. Further, the court determined that the hospital had a statutory duty to treat Hord for his service-connected disability pursuant to the federal statutes entitling Hord to care at a VA hospital. The district court also found that the failure of the hospital to treat Hord proximately caused his suffering and death from cancer and awarded Appellee $3,006,805.

II.

Absent waiver, sovereign immunity shields the United States from suit. See FDIC v. Meyer, 510 U.S. 471, 475 (1994). However, the FTCA provides that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C.A. § 2674; see also 28 U.S.C.A. § 1346(b)(1) (West Supp. 1998).

In order to establish liability for negligence under South Carolina law, a plaintiff must prove duty, breach, injury, and causation. See Allen v. Long Mfg. NC, Inc., 505 S.E.2d 354, 359 (S.C. Ct. App. 1998). A duty may be established based on the existence of a doctor/patient relationship. See Tumblin v. Ball-Incon Glass Packaging Corp., 478 S.E.2d 81, 85 (S.C. Ct. App. 1996). The doctor/patient relationship "is a consensual one wherein the patient knowingly seeks the assistance of a physician and the physician knowingly accepts him as a patient." Roberts v. Hunter, 426 S.E.2d 797, 799 (S.C. 1993) (internal quotation marks omitted). A doctor/patient relationship can arise from a successful referral of a patient from one doctor to another. See Bovara v. St. Francis Hosp., 700 N.E.2d 143, 146 (Ill. App. Ct. 1998) (stating that a doctor/patient "relationship can be found to exist where a physician contacts another physician on behalf of the patient or where a physician accepts a referral of a patient" (citation omitted)); Podvin v. Eickhorst, 128 N.W.2d 523, 526-27 (Mich. 1964) (holding that whether referral of patient's case to new doctor created doctor/patient relationship with new doctor was at least a question of fact). Whether a doctor/patient relationship has been created is a question of fact. See Tumblin, 478 S.E.2d at 85. We

6

review the findings of fact of the district court for clear error. See Scrimgeour v. Internal Revenue, 149 F.3d 318, 324 (4th Cir. 1998).

The United States focuses its attack on the findings of the district court that a doctor/patient relationship arose from the referral to Dr. Valdivieso[5] and that the failure of the hospital to provide precautionary care proximately caused Hord's death. We address these issues seriatim.

A.

The United States first contends that the district court clearly erred in finding that a doctor/patient relationship was created between Hord and Dr. Valdivieso. We disagree.

The United States does not dispute the findings of the district court that Dr. Bearden contacted Dr. Valdivieso to refer Hord's care to him or that Dr. Bearden advised Dr. Valdivieso that Hord had had cancer, that the cancer had been adjudicated as service-connected, and that Hord needed precautionary care, including a colonoscopy. Likewise, the United States does not challenge the determination by the district court that Dr. Valdivieso agreed to notify Dr. Bearden if any problems arose. Rather, the United States, relying primarily on Roberts v. Hunter, 426 S.E.2d 797 (S.C. 1993), contends that these facts were insufficient as a matter of South Carolina law to establish that Dr. Valdivieso knowingly accepted Hord as a patient.

In Roberts, an emergency room treating physician contacted a neurologist at the same hospital and requested that he examine Roberts. Although the neurologist stated that he would do so, Roberts left the emergency room 15 to 20 minutes later, before the neurologist arrived. Roberts claimed that the neurologist's statement that he would examine Roberts created a doctor/patient relationship and that the neurologist breached that duty by failing to examine him immediately. The South Carolina Supreme Court rejected that claim, determining as a matter of law that no doctor/patient relationship had been

_____

[5] The United States does not challenge the conclusion of the district court that the existence of the doctor/patient relationship between Hord and Dr. Valdivieso gave rise to a duty on the part of the hospital.

7

established by the neurologist's mere agreement to examine Roberts. See id. at 799. The Government argues that Roberts sets forth a rule that no doctor/patient relationship can ever be formed absent an examination of the patient or a review of his records. See id. (noting that the neurologist "neither examined Roberts nor reviewed his file").

We disagree with the Government's reading of Roberts. The South Carolina Supreme Court made clear in Roberts that the agreement of the doctor to assist the patient is a sine qua non of the doctor/patient relationship. See id. (explaining that the doctor/patient relationship "is a consensual one wherein the patient knowingly seeks the assistance of a physician and the physician knowingly accepts him as a patient" (internal quotation marks omitted)). This principle is consistent with South Carolina law that when the physician "neither offer[s] nor intend[s] to treat, care for, or otherwise benefit the individual"--in contrast to the situation in which "the physician... assume[s] the role of treating the patient"--the doctor/patient relationship is not formed. Tumblin, 478 S.E.2d at 85 (internal quotation marks omitted). Mere examination of an individual, in the absence of an agreement to benefit the patient, does not constitute acceptance of that individual as a patient. See id. (recognizing that mere examination of patient on behalf of a third party does not create a doctor/patient relationship). A fortiori, an agreement to examine, without an agreement to benefit the patient, does not rise to the level of a doctor/patient relationship. See Lyons v. Grether, 239 S.E.2d 103, 105 (Va. 1977) (recognizing that a showing that patient merely had an appointment with a doctor would be insufficient to establish a doctor/patient relationship, but a showing that patient had been given an appointment for treatment of a specific condition would be adequate). For example, a doctor who examines an individual on behalf of a prospective employer does not thereby create a doctor/patient relationship. See Tumblin, 478 S.E.2d at 85. Further, a doctor may examine an individual for the purpose of determining whether to undertake care without establishing a doctor/patient relationship. See Childers v. Frye , 158 S.E. 744, 746 (N.C. 1931) (recognizing that "[a] physician ... is not bound to render professional services to everyone who applies" and holding that doctor who examined individual but declined to undertake care did not create doctor/patient relationship (internal quotation marks omitted)).

Roberts states that the neurologist agreed to examine Roberts, but the opinion does not state that the neurologist agreed to accept Rob-

8

erts as a patient or to do anything for Roberts' benefit. See Roberts, 426 S.E.2d at 798. Thus, we believe that Roberts is best understood as stating a very narrow holding that a mere agreement to examine a patient, absent an agreement to benefit the patient, does not constitute a doctor/patient relationship. Accordingly, Roberts need not be read as holding that only an examination or treatment of the patient can give rise to a doctor/patient relationship and as rejecting the proposition that a doctor/patient relationship can be formed based on the agreement of the physician to treat in the absence of an examination. Indeed, in light of the recognition by the South Carolina Supreme Court that the doctor/patient relationship is a consensual one formed when the patient seeks assistance and the physician agrees to provide it, see Roberts, 426 S.E.2d at 799, reading Roberts as the Government suggests--to say that the existence of a doctor/patient relationship is dependent upon a physician's examination of the patient or his records--would render the opinion internally inconsistent.

Here, the facts as determined by the district court establish that Dr. Valdivieso agreed to accept Hord as a patient for the purpose of providing his precautionary care for appendiceal cancer. As the district court found, Dr. Valdivieso accepted the referral from Dr. Bearden with the understanding that Hord required a colonoscopy. This factual finding is not clearly erroneous because Dr. Bearden testified that he contacted Dr. Valdivieso by phone for the purpose of referring Hord to him as a patient and that Dr. Valdivieso accepted the referral of Hord's care. Dr. Valdivieso did not dispute that Dr. Bearden's recollection of this telephone conversation was accurate. Thus, we conclude that the finding of the district court that a doctor/patient relationship existed between Hord and VA physician Dr. Valdivieso was not clearly erroneous.**6**

_____

**6** The United States also contends that no duty to treat Hord arose from its federal statutory obligations to veterans with service-related injuries. We need not address this issue, however, in light of our conclusion that the district court did not clearly err in finding the existence of a doctor/patient relationship.

B.

The United States also contends that the district court erred in finding that the hospital's failure to schedule Hord for a colonoscopy and other precautionary care proximately caused his death. Specifically, the United States maintains that the court clearly erred in determining that the cancer that resulted in Hord's death was a second primary cancer rather than the consequence of seeding from the first. The United States argues that the opinion of Dr. Bearden, who is not a pathologist, should not have been credited, asserting that Dr. Bearden's opinion was formed in reliance on an interpretation of pathological evidence that conflicted with the conclusions of two pathologists to whom Dr. Bearden testified he would defer. We find no clear error.

Proximate cause issues are generally ones of fact. See McNair v. Rainsford, 499 S.E.2d 488, 497 (S.C. Ct. App. 1998). The conclusion of the district court that the cancer that caused Hord's death was a second primary tumor rather than the effect of seeding from the first tumor was based upon the myriad factors astutely outlined in the opinion of the district court. See Hord v. United States, No. 7:96-3401-13, at 22-36 (D.S.C. Feb. 12, 1998). While Dr. Bearden considered the slide interpretations of the pathologists who testified on behalf of the United States, his conclusions concerning the origin and nature of Hord's fatal tumor were based primarily on the factors discussed by the district court, rather than on the pathologists' opinions. Accordingly, we conclude that the district court did not clearly err in crediting Dr. Bearden's testimony and determining that the failure to schedule Hord for a colonoscopy and other precautionary treatment proximately caused his death.

III.

In sum, we affirm the judgment against the United States because we conclude that the district court did not err in finding that a doctor/patient relationship was established between Hord and Dr. Valdivieso and that the cancer that caused Hord's death was a second primary tumor originating in Hord's colon.

AFFIRMED