649 A.2d 1212

**Keisha T. Guadalupe RIVERA, a minor, etc., et al.**

**v.**

**PRINCE GEORGE'S COUNTY HEALTH DEPARTMENT, et al.**

**No. 407, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Dec. 2, 1994.

W. Ray Ford, Bowie, for appellants.

Denise A. Greig (Kathleen Howard Meredith, P.A., Semmes, Bowen & Semmes, on the brief), Baltimore, for appellee, Prince George's County Health Dept.

J. Joseph Curran, Jr., Atty. Gen. and Joseph Gill, Asst. Atty. Gen., on the brief, Baltimore, for appellee, State of Maryland.

Daniel C. Costello (Andrew E. Vernick and Wharton, Levin, Ehrmantraut, Klein & Nash, P.A., on the brief), Annapolis, for appellee, Oh.

Argued before WILNER, C.J., and CATHELL and MURPHY, JJ.

CATHELL, Judge.

Appellant, Keisha T. Guadalupe Rivera, a minor, bringing suit by her mother and next friend, Maria Rivera, appeals the judgment of the Circuit Court of Prince George's County (Femia, J.), that granted appellee's, Dr. Soo Young Oh's, Motion for Summary Judgment, and granted appellee's, Prince George's County Health Department's, Motion to Dismiss. Appellant alleges that appellees were negligent in their medical treatment and care of Maria Rivera during the time she was pregnant and expecting appellant's birth. The Health Department contends that it is immune from liability in this case. Dr. Oh denies liability. Alleging error in the trial court's judgment in favor of appellees, appellant poses the following questions for our review:

 I. Did the trial court err in ruling that the plaintiff's claims against the Health Department were barred by the doctrine of sovereign immunity?

 A. Pursuant to Maryland Code Annotated, Article 48A, section 480 if a defendant is both a charitable corporation and a governmental agency is the insurer of the defen-

dant estopped only from asserting that the insured is exempt as a charitable institution or is the insurer also estopped from asserting that the defendant is exempt as a governmental agency?

B. May the action be brought pursuant to the Maryland Tort Claims Act?

C. Are the claims brought on behalf of Keisha Rivera barred as a consequence of the failure of the claimant to submit a written claim to the State Treasurer within 180 days after the injury to Keisha that is the basis of the claim?

D. Are the claims brought on behalf of Keisha Rivera barred as a consequence of the failure of the claimant to submit any written claim to the State Treasurer?

II. Does the decision of the trial court dismissing the claims brought on behalf of Keisha Rivera against the Health Department bar any further claim or action brought by or on behalf of Keisha Rivera pursuant to the law of the case doctrine?

III. Does the release of Roberto Casas, M.D. operate to release the Health Department from liability asserted upon the doctrine of respondeat superior?

IV. Did Dr. Oh as the obstetrical attending physician have the right to control the conduct of the hospital residents such that he is liable for their negligence, and was his conduct in failing to properly exercise that control negligent? [1]

On September 5, 1978, at 2:30 a.m. and 10:00 a.m., a pregnant Maria Rivera ("Ms. Rivera"), appellant's mother, went to Prince George's County Hospital Center ("the Hospital"), complaining of ruptured membranes and pains occurring ten minutes apart. She was examined by a hospital resident on both occasions and instructed to return home. Later that

---

1. Appellant misidentifies Dr. Oh as an attending physician. He was, in fact, during the time the negligence allegedly occurred, an obstetrical "on call" physician.

evening, Ms. Rivera sought treatment at a clinic operated by the Prince George's County Health Department ("the Health Department") for the same symptoms. Dr. Roberto Casas examined Ms. Rivera and similarly instructed her to go home. Two more visits to the Hospital on September 7, 1978 produced similar recommendations. Ms. Rivera was then taken to the Hospital the next morning by ambulance. She was admitted at 7:15 a.m. with evidence of fetal distress. A caesarean section was ultimately performed and completed by 9:25 a.m. It was at this point that Dr. Oh was called to approve performance of the operation, as he was the "on call" physician during the first two weeks of September 1978. He is listed on the operative record as a "stand-by" physician. This both began and ended the extent of Dr. Oh's contact with the child. The minor appellant was subsequently diagnosed as suffering from severe mental retardation caused by "hypoxia," a condition where an infection invades the uterus and deprives the fetus of oxygen. This damage to the child had, therefore, necessarily occurred before the caesarean section was performed.

It was determined by expert testimony that a majority of the damage to the child occurred by September 8 at 7:35 a.m. and had undoubtedly been complete by 8:38 a.m., before the caesarean section was performed. There was some dispute as to the exact time Dr. Oh first became aware of Ms. Rivera's condition. As the decision to perform the caesarean section was confirmed at 8:38 a.m. on September 8, it was adduced at trial that he was first contacted sometime between 8:15 a.m. and that time. There was no allegation of any delay on Dr. Oh's part or any negligent conduct by him after he was called.

On January 29, 1990, a claim was filed with the Health Claims Arbitration Office ("HCAO") on behalf of appellant by her mother and next friend, Ms. Rivera, and on behalf of Ms. Rivera, individually.[2] Listed as defendants in the action were

---

**2.** It is undisputed that the claims asserted by Ms. Rivera individually were barred by the applicable Statute of Limitations and are properly not the subject of this appeal.

the Hospital, Dr. Oh, the Health Department, and Dr. Casas. The Health Department's Motion to Dismiss was granted by the Health Claims Arbitration Panel on January 18, 1991. Appellant filed a Notice of Rejection of Award and Action to Nullify the Health Claims Arbitration Award on April 8, 1991. An action commenced in the Prince George's County Circuit Court was stayed pending arbitration of the remaining claims. Appellant entered into settlement agreements with Dr. Casas and the Hospital on April 28, 1992. On April 29, 1992, a Motion for Summary Judgment was then granted by HCAO in favor of Dr. Oh. A second Notice of Rejection and Action to Nullify was filed.

In the circuit court, the Health Department once again moved to dismiss the case, based on a defense of sovereign immunity. In the alternative, the Health Department argued that a release of Dr. Casas, its agent, operated to release the Health Department as his principal. Dr. Oh similarly renewed his Motion for Summary Judgment, denying any negligent conduct or a lack of proximate cause thereof. A January 7, 1994 hearing resulted in a grant of both of appellees' motions by the circuit court. This appeal was then timely filed.

## I

 Appellant assigns error in the trial court's judgment that her claim against the Department is barred by the doctrine of sovereign immunity.[3] Before the trial judge, she claimed that, in accordance with Maryland law, sovereign immunity had been waived; she had been given permission to sue the State and/or its instrumentalities and provision for the payment of judgments had been made. *See Jackson v. Housing Opportunities Comm'n,* 289 Md. 118, 123, 422 A.2d 376

---

3. "Grounded in ancient common law, the doctrine of sovereign immunity bars individuals from bringing actions against the State, thus protecting it from interference with governmental functions and preserving its control over its agencies and funds." *Condon v. State,* 332 Md. 481, 492, 632 A.2d 753 (1993).

(1980). She asserts that the waiver can be found in Article 48A, § 480 of the Annotated Code of Maryland (1957, 1994 Repl.Vol.), which involves charitable immunity.[4] Appellant is mistaken in relying thereon for several reasons.

Appellant contends that, according to *Cotham v. Board of County Comm'rs,* 260 Md. 556, 273 A.2d 115 (1971) (a case involving a hospital operated by the county), "when there's [a] specific waiver as to charitable immunity it doesn't matter whether it's a governmental entity. The charitable immunity applies." We reject that contention. While there can be no doubt that the Health Department is a governmental entity, and appellant concedes as much, the characterization of the Health Department as a charitable institution is less clear.[5] An organization's charitable status is determined by an "examination of the stated purposes of the organization, the actual work performed, the extent to which the work performed benefits the community and the public welfare in general, and the support provided by donations." *Supervisor of Assessments v. Group Health Ass'n, Inc.,* 308 Md. 151, 157, 517 A.2d 1076 (1986).

The Health Department is not a separate entity operated by the county as a proprietary function, nor is it supported by donations. Rather, it is established and supported as an agency with public tax-generated funds. It performs governmental functions. These facts would tend to preclude its inclusion within the category of charitable organizations.

---

4. That section reads:
 Each policy issued to cover the liability of any charitable institution for negligence or any other tort shall contain a provision to the effect that the insurer shall be estopped from asserting, as a defense to any claim covered by said policy, that such institution is immune from liability on the ground that it is a charitable institution.

5. We note that if appellant were to be successful in categorizing the Health Department as a charitable entity, it would still be immune from suit. *See Abramson v. Reiss,* 334 Md. 193, 638 A.2d 743 (1994); *Eliason v. Funk,* 233 Md. 351, 196 A.2d 887 (1964); *McCormick v. St. Francis de Sales Church,* 219 Md. 422, 149 A.2d 768 (1959). Its insurer would not, however, be able to plead that immunity to the extent that the tort liability would be covered by insurance.

Therefore, any argument predicated upon a charitable immunity theory is inapposite in the case *sub judice*.[6]

■ Appellant, however, argues that, once the Health Department stated that it was charitably immune in its Answer, it became bound thereby and cannot now argue to the contrary. *See Thomas v. Solis,* 263 Md. 536, 544 n. 4, 283 A.2d 777 (1971); *Matthews v. Kernewood, Inc.,* 184 Md. 297, 306, 40 A.2d 522 (1945); *Parker v. Tilghman v. Morgan, Inc.,* 170 Md. 7, 25, 183 A. 224 (1936); *People's Counsel v. Mangione,* 85 Md.App. 738, 745–46, 584 A.2d 1318 (1991). An organization or institution is either charitable or it is not. It is patently clear that the Health Department is a public governmental agency and, in performing its function as such, is providing *governmental,* not charitable, services. The Health Department, despite the fact that some of its governmental features may resemble charitable services offered by private entities, encompasses no separate and distinct "charitable" features within the meaning of the phrase. Accordingly, it cannot waive its immunity, particularly by way of an erroneous assertion contained in a pleading. *See* Maryland Rule 2–324(a). The trial court, therefore, correctly held that the Health Department was immune from liability by virtue of its status as an entity of the sovereign, absent any waiver thereof. *See Condon,* 332 Md. at 492, 632 A.2d 753 ("The doctrine is applicable to the State's agencies and instrumentalities, unless the legislature has explicitly or by implication waived governmental immunity." (citing *Godwin v. County Comm'rs,* 256 Md. 326, 334, 260 A.2d 295 (1970)).

---

**6.** Moreover, use of Art. 48A, § 480 cannot be enjoyed by appellant as it is directed solely at those insurance companies that seek to avoid liability by claiming both sovereign and charitable immunity for its hybrid governmental-charitable insureds. *See Howard v. Bishop Byrne Council Home, Inc.,* 249 Md. 233, 236, 238 A.2d 863 (1968) (Art. 48A, § 480 is "directed to the insurer."); *Abramson v. Reiss,* 334 Md. 193, 197, 638 A.2d 743 (1994) (Art. 48A, § 480 "did no more than restrict the use of the doctrine [of charitable immunity] by an insurer, not by the charitable institution.").

■ We, therefore, now turn to the issue of whether sovereign immunity was waived in this case. In so doing, we pay close attention to Judge Rodowsky's comments in *Jackson v. Housing Opportunities Comm'n*, 289 Md. at 123, 422 A.2d 376:

> A court should not hold that immunity has been waived except in cases of positive consent given, or by necessary and compelling implication. Any waiver of immunity must come from the Legislature whose intent we strive to effectuate. The test is two pronged. An asserted waiver of immunity is ineffective "unless specific legislative authority to sue the agency has been given, and unless there are funds available for the satisfaction of the judgment, or power reposed in the agency for the raising of funds necessary to satisfy a recovery against it." [*Katz v. Washington Suburban Sanitary Comm'n*, 284 Md. 503, 513, 397 A.2d 1027 (1979) ].

*See also State v. Harris*, 327 Md. 32, 607 A.2d 552 (1992). Appellant's first contention, that the "specific legislative authority to sue" the Health Department "is found by necessary and compelling implication in the language of Article 48A, section 480," is erroneous. Not only do courts of this State disfavor waiver by implication, but we have also previously stated the general inapplicability of the aforementioned statutory provision to this case. Appellant, however, alternatively cites, as authority to institute and maintain the action against the Health Department, the Maryland Tort Claims Act (MTCA), Maryland Code (1984, 1993 Repl.Vol.) §§ 12–101 to 12–110 of the State Government Article (SG).[7] It is to this that we now turn.

The MTCA was enacted by the General Assembly in 1981 by Chapter 298 of the Acts of 1981 with a view to "afford[ing] a remedy for individuals injured by tortious conduct attributable to the State." *Condon*, 332 Md. at 492, 632 A.2d 753.

---

7. The parties direct our attention to the Maryland Tort Claims Act applicable to state agencies. We address the issues as presented to us by them.

Until its enactment and absent its applicability, the State and its various agencies could not be sued without legislative authorization and an availability of funds. *See Board v. John K. Ruff, Inc.*, 278 Md. 580, 366 A.2d 360 (1976); *University of Maryland v. Maas*, 173 Md. 554, 197 A. 123 (1938). The 1981 version of the Act contained a limited waiver of the State's sovereign immunity in certain tort actions to the extent of coverage by a program of insurance established by the State Treasurer. By Chapter 538 of the Acts of 1985, the General Assembly amended the MTCA to broaden the State's liability by extending the waiver of immunity to tort actions generally. Unlike the original Act, however, which allowed a claimant to file a claim anytime within the three year limitations period and, on occasion, even after its expiration, the 1985 amendments significantly narrowed the time within which claims could be filed under the Act. *See, generally, Condon*, 332 Md. at 492–94, 632 A.2d 753; *Simpson v. Moore*, 323 Md. 215, 218–219, 592 A.2d 1090 (1991). *See also Dean v. Board of Educ.*, 71 Md.App. 92, 101, 523 A.2d 1059 (1987).

As it now stands, claimants must file a written claim with the State Treasurer "within 180 days after the injury to [the] person or property that is the basis of the claim...."[8] SG § 12–106. *See also Simpson v. Moore*, 323 Md. 215, 219, 592 A.2d 1090 (1991) (Filing a claim within 180 days after injury is a condition precedent to bringing an action under the Maryland Tort Claims Act.). "The whole purpose of the notice requirement [is] to enable the public body to make a timely investigation of the facts in order 'to ascertain the character and extent of the injury and its responsibility in connection with it....'" *Dean*, 71 Md.App. at 99, 523 A.2d 1059 (quoting *Jackson v. Board of County Comm'rs*, 233 Md. 164, 167, 195 A.2d 693 (1963)).

---

**8.** SG § 12–106 also requires that the Treasurer deny the claim finally (as defined in SG § 12–107(d)) and that the action be filed by the later of one year after final denial of the claim or three years after the cause of action arises.

Appellant places heavy reliance on *Foor v. Juvenile Servs. Admin.*, 78 Md.App. 151, 552 A.2d 947, *cert. denied*, 316 Md. 364, 558 A.2d 1206 (1989), for the proposition that her case was appropriately brought as an action "filed on or after July 1, 1985," within the meaning of Act, as amended. In *Foor*, the cause of action arose in 1983, when the original MTCA was in effect, but suit was brought in 1986, following amendment thereof. The State sought to bar the Foors from recovery by arguing that the 1981 Act governed the cause of action and its sovereign immunity remained intact. Chief Judge Wilner, writing for this Court, iterated the legislative intent underlying such legislation and concluded that, in sharp contrast to prior, as well as similar legislation on the subject, the 1985 amendment had expanded certain aspects of the MTCA. We held that the amendment, which simply stated that it "shall take effect July 1, 1985," was intended "to apply to actions *filed* on or after July 1, 1985, and not just to actions *accruing* after that date." [9] *Foor*, 78 Md.App. at 162–64, 552 A.2d 947. The Foors, therefore, were permitted to proceed within the ambit of the 1985 Act and obtain recovery based thereon. It was, however, not necessary in *Foor* to point out that, while the cause of action at issue arose prior to the date of the 1985 amendment, it did so during a period when sovereign immunity could be waived, *i.e.*, 1983, provided certain procedural requirements were met.

In the case *sub judice*, the cause of action arose in 1978 (though the claim was not filed in the HCAO until 1990), prior to enactment of any of the State Tort Claims Acts, at a time when immunity had not yet been waived by any statute. Appellant now seeks to use our interpretation of the 1985 amended Act in *Foor* to provide justification for filing a claim against appellees more than eleven and one-half years after the injury occurred—an injury that occurred at a time during which sovereign immunity was in full effect. As previously stated, we distinguish that case by the fact that the original

---

**9.** Prior to this, the "arising or accruing after" language was used to restrict the number of cases brought under the respective statutes.

cause of action in *Foor* arose at a time when some version of the MTCA was in effect, while in the case *sub judice,* the cause of action arose prior to any enactment of any applicable statute waiving state tort immunity.

Moreover, we need not even address under which State Act appellant may proceed, as she failed to comply with the filing requirements mandated by both versions. Under the 1981 MTCA, litigants were required to file a claim with the State Treasurer at any time within the three year statute of limitation. This would have required the mother's claim to be filed by 1984.[10] Under the 1985 amended Act, however, appellant is required to file a notice within 180 days of the injury. Even if appellant could bring a cause of action following enactment of the 1985 amendments, roughly seven years after the injury occurred, she would have been required to give notice or file within 180 days of the effective date of the amendment or by about January 1, 1986.[11] Her filing in 1990 therefore clearly falls outside the applicable notice period and comes too late to preserve any remedy.

While it is true that SG § 12–102 contemplates broad construction of the MTCA "to assure that injured parties have a remedy," we will not extend or suspend the filing requirements when they are so clear and unambiguous. In so

---

**10.** Appellant claims that "[t]he applicable statute of limitation on the claims advanced on [her] behalf ... does not expire until September 1999." That may be, but the Court of Appeals has specifically stated that the 180 day filing requirement is not tolled during a plaintiff's minority. *Johnson v. Maryland State Police,* 331 Md. 285, 290, 628 A.2d 162 (1993). Therefore, with appellant's failure to give proper notice (or any notice at all) or to file within 180 days, the immunity was not waived, regardless of the suspension in the tolling of the statute of limitations during appellant's minority.

We note, further, that were this to be permitted under the MTCA, the investigatory purpose underlying the 180–day condition would clearly be frustrated. There can be no doubt that an investigation of an injury conducted eleven or more years after the complained of injury might well be incomplete and factually inaccurate.

**11.** This is roughly 180 days from the effective date of the revised MTCA, July 1, 1985.

stating, we are mindful of the Court of Appeals's admonition that the MTCA

> cannot serve as a springboard for judicial legislation. Provisions such as this, and the canon of construction favoring a liberal interpretation of remedial legislation, are helpful in resolving ambiguities in statutes, but do not permit us to expand the statute to afford relief where the words of the statute bar that relief.

*Simpson*, 323 Md. at 227, 592 A.2d 1090. Appellant cites *Dean v. Board of Educ., supra,* in support of suspension of the filing requirement in the case *sub judice. Dean*, however, is inapposite, as it did not involve any version of the MTCA. Rather, the law at issue in *Dean* was Maryland Code (1974, 1989 Repl.Vol.) § 5–306 of the Courts and Judicial Proceedings Article, predecessor of the current § 5–404, which applied to claims for unliquidated damages made against a county or municipal organization. Section 5–306 was originally a public local law applicable only to Montgomery County, and was ultimately repealed and later readopted to apply throughout the State. The statutory provision involved in *Dean* permitted, "for good cause shown and in the absence of prejudice to the defendant," entertainment of the action even in the absence of the requisite notice. *See Dean,* 71 Md.App. at 96, 523 A.2d 1059. No such "escape" mechanism exists in the MTCA.[12]

---

12. The following has been proffered as a rationale therefor:

> In adopting a 180–day requirement without also adopting any exception to that requirement, the legislature has imposed a condition precedent which carries with it the rigors of the pre–1972 law governing notice to municipalities. The legislature was aware of the existence and contents of the 180–day notice provision when it borrowed from [it] in imposing a 180–day requirement in the MTCA. Indeed, the legislative history shows specific references to § 5–306 of the Courts Article, where the notice provision was then codified. The legislature could have, if it wished, tracked the exception provision of that statute in amending the MTCA. For whatever reason, it did not do so, and we are not free to judicially place in the statute an entire section of language which is not there.

> *Simpson v. Moore,* 323 Md. 215, 225, 592 A.2d 1090 (1991).

Nevertheless, "substantial compliance with the requirements of the MTCA is sufficient to satisfy the condition precedent to the State's waiver of sovereign immunity." *Conaway v. State*, 90 Md.App. 234, 242, 600 A.2d 1133 (1992). *Simpson v. Moore*, 323 Md. 215, 592 A.2d 1090, is illustrative in this regard. There, a wrongful death claim against the State was filed three years after the deceased was killed, outside the requisite 180–day time frame. The claimant sought to carve out of SG § 12–106 the exceptions to the notice provisions contained in § 5–306—namely, for good cause and lack of prejudice to the defendant—so as to permit an excuse for late filing. Judge McAuliffe, speaking for the Court, refused to " 'judicially place in the statute language which is not there' in order to avoid a harsh result." 323 Md. at 225, 592 A.2d 1090 (quoting *Cotham*, 260 Md. at 565, 273 A.2d 115). The Court noted that, despite the dissatisfaction presented by the 180–day requirement, it was for the legislature to resolve; " '[t]o supply omissions transcends the judicial function.' " *Id.* at 228, 592 A.2d 1090 (quoting *Iselin v. United States*, 270 U.S. 245, 251, 46 S.Ct. 248, 250, 70 L.Ed. 566 (1926)). Following an analysis of the Act's legislative history, the Court concluded:

> In the absence of statutory authority to excuse the late filing, the claim against the State must fail. The doctrine of substantial compliance has no application to an outright failure to comply, and compliance in this case was a condition precedent to the maintenance of a claim against the State.

*Id.* at 228–29, 592 A.2d 1090.

It is uncontroverted that appellant filed nothing with the State Treasurer at any time. She commenced her action against appellees when she filed her claim with the Health Claims Arbitration Office in January of 1990. There is *no* suggestion or evidence that appellant complied with the filing requirements in *any* respect. Compliance with the conditions laid out in SG § 12–106 is mandatory to a waiver of sovereign immunity. Absent such compliance, the immunity remains intact.

 The trial court granted the Health Department's Motion to Dismiss. A motion to dismiss lies where there is no justiciable controversy. *Broadwater v. State*, 303 Md. 461, 467, 494 A.2d 934 (1985). Judge Harrell, speaking for this Court in *Tafflin v. Levitt*, 92 Md.App. 375, 379, 608 A.2d 817, *cert. denied*, 328 Md. 447, 614 A.2d 974 (1992), set forth our standard of review of such motions: "The appropriate standard of review of the grant or denial of a motion to dismiss is whether the well-pleaded allegations of fact contained in the complaint, taken as true, reveal any set of facts that would support the claim made." (citing *Flaherty v. Weinberg*, 303 Md. 116, 135–36, 492 A.2d 618 (1985)). *See also Waller v. Maryland National Bank*, 95 Md.App. 197, 234–35, 620 A.2d 381, *vacated on other grounds*, 332 Md. 375, 631 A.2d 447 (1993). Moreover, "[i]f any material facts alleged in [the] complaint tend to support her right to recover, the order to dismiss must be reversed; we limit our consideration ... to allegations of fact and the inferences deducible therefrom, and not 'merely conclusory charges.'" *Lee v. Denro, Inc.*, 91 Md.App. 822, 828, 605 A.2d 1017 (1992) (quoting *Parker v. The Columbia Bank*, 91 Md.App. 346, 604 A.2d 521, *cert. denied*, 327 Md. 524, 610 A.2d 796 (1992)). Although the trial court failed to enumerate the grounds on which the grant was made, we look to all allegations and hold that, indeed, no "justiciable controversy" existed. We see nothing to support a claim against the Health Department and, therefore, see no error in the trial court's grant of the Health Department's Motion to Dismiss.

II

In posing her second issue, appellant seeks to exact from this Court, in essence, a determination as to whether her claims would be barred by the doctrine of *res judicata* in a subsequent action by virtue of the grant of the Motion to Dismiss. Appellant alleges that the trial court granted the motion based on the fact that the MTCA is not applicable to appellant's cause of action. She believes, however, that the MTCA does apply, and that a grant of the motion should have

been based, instead, on the fact that she failed to comply with the 180 day filing requirement. Appellant fears that "[t]he erroneous ground relied on by the trial court could defeat forever the claims made on [her] behalf ... against the Department were the decision of the trial court not appealed."

The trial court failed to enunciate its rationale for granting the Health Department's motion.[13] Therefore, any review thereof would be mere surplusage. Moreover, we hesitate to address such an inquiry, as it would require us to issue an advisory opinion. "[T]he addressing of non-justiciable issues would place courts in the position of rendering purely advisory opinions, a long forbidden practice in this State." *Hatt v. Anderson,* 297 Md. 42, 46, 464 A.2d 1076 (1983). "[A] controversy is justiciable when there are interested parties asserting adverse claims upon a state of facts which must have accrued wherein a legal decision is sought or demanded." *Id.* at 45–46, 464 A.2d 1076 (citing *Reyes v. Prince George's County,* 281 Md. 279, 288, 380 A.2d 12 (1977)). Having previously determined that no justiciable controversy exists in the case *sub judice* respecting appellant's claim against the Health Department, we further hold that we are precluded from addressing this portion of appellant's case.[14]

## III

Appellant alleges that the Health Department improperly relies on the release of Dr. Casas to disclaim liability. Although we hold that the Health Department is immune from liability and appellant failed to take any proper action to

---

**13.** We do note, however, that, "[a]lthough the 'merits' of the underlying cause of action are never heard when a ... motion is granted on grounds of sovereign immunity, ... the judgment entered is indeed a final judgment on the merits for purposes of *res judicata." Annapolis Urban Renewal Authority v. Interlink, Inc.,* 43 Md.App. 286, 291, 405 A.2d 313 (1979).

**14.** There is also some dispute between the parties as to whether the motion was granted "with prejudice" or "without prejudice." Given the manner in which we dispose of this issue, we make no comment in this regard.

invoke a waiver of that immunity, we address this issue to clarify the law underlying it.

The Health Department believes that appellant's release of Dr. Casas also operated to release it, as his principal, from liability. Appellant seeks instead to obtain judgment against the Health Department notwithstanding the release. At issue is the fundamental difference between the vicarious liability of a master for the negligent acts of a servant and the joint liability of two or more negligent actors who act in concert to produce harm.

We set forth the pertinent language of the release:

## SETTLEMENT AGREEMENT AND JOINT TORTFEASOR RELEASE

. . . .

1.1 In consideration of the payments set forth in Section 2, Claimant Keisha T. Guadalupe Rivera, a Minor, by her Mother and Next Friend, Maria D. Rivera, and Maria D. Rivera, Individually, hereby release and forever discharge Health Care Provider, Roberto Casas, M.D., his Insurers, his heirs, executors, administrators, and assigns from any and all claims, demands, obligations, actions or causes of action, whether existing in law or in equity, for all damages, costs, pain and suffering, expenses, compensation, consequential damages of any other thing whatsoever, whether now known or unknown, which Claimants presently have or in the future may have by reason of any matter relating to the alleged negligent acts and omissions of the Health Care Provider, Roberto Casas, M.D. which are the subject of the lawsuit captioned, in the Health Claims Arbitration Office of Maryland, HCA Number 89–401. The release and discharge and the payments to be made shall a fully binding and complete settlement agreement between the parties to this Settlement Agreement and Joint Tortfeasor Release all parties represented by or claiming through the Claimants. It is further understood and agreed that the Claimants are not releasing any claims, demands, actions and causes of

action, which have been accrued or may hereinafter accrue to the Claimant against ... [the] Prince George's County Health Department and Soo Young Oh, M.D.... It is understood and agreed that this payment made is not to be construed as an admission of liability on the part of the Releasee; however, the Releasee, Roberto Casas, M.D. is deemed to be a joint tortfeasor for the purposes of this Release....

Appellant argues that the Health Department should be characterized as a "joint tortfeasor" within the meaning contemplated by the Uniform Contribution Among Joint Tortfeasors Act (UCATA), codified in the Annotated Code of Maryland (1957, 1994 Repl.Vol.), Article 50, §§ 16–24.[15] The Health Department, on the other hand, seeks characterization of its relationship with Dr. Casas as that of a principal and an agent so that it may reap the benefits flowing therefrom. It states that "[t]he only liability asserted against [it] is vicarious liability for the acts of its alleged agent, Roberto Casas, M.D." We, therefore, turn to whether the Health Department's liability is derived from a joint or a vicarious relationship with Dr. Casas.

 Joint liability is predicated on the existence of two or more individuals who have each committed wrongs and are both legally responsible for the damage caused to a person or property by the commission of those wrongs. Vicarious liability is, instead, the attribution of a wrongdoer's actions to an innocent third party by virtue of the relationship between the wrongdoer and the third party.

---

**15.** "Joint tortfeasors" are defined in Art. 50, § 16 as "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." This definition has been found "broad enough to include a person liable solely by reason of *respondeat superior.*" *Chilcote v. Von Der Ahe Van Lines,* 300 Md. 106, 113, 476 A.2d 204 (1984). *But see* our discussion *supra* and the discussion in *Anne Arundel Medical Center v. Condon,* 102 Md.App. 408, 649 A.2d 1189 (1994) [intended to be filed simultaneously herewith].

The rules of vicarious liability respond to a special need in the law of torts: how to fully compensate an injury caused by the act of a *single* tortfeasor. Upon a showing of agency, vicarious liability increases the likelihood that an injury will be compensated, by providing two funds from which a plaintiff may recover. If the ultimately responsible agent is unavailable or lacks the ability to pay, the innocent victim has recourse against the principal. If the agent is available or has means to pay, invocation of the doctrine is unnecessary because the injured party has a fund from which to recover.

The system of contribution among joint tortfeasors, of which the [UCATA]'s apportionment rules are a key component, has arisen completely apart from the system of vicarious liability and indemnity and meets an entirely distinct problem: how to compensate an injury inflicted by *the acts of more than one tortfeasor.* Unlike the liability of a principal, the liability of a joint tortfeasor is direct (because the tortfeasor actually contributed to the plaintiff's injury) and divisible (since the conduct of at least one other also contributed to the injury). [Emphasis added.]

*Mamalis v. Atlas Van Lines, Inc.,* 522 Pa. 214, 560 A.2d 1380, 1383 (1989) (quoting *Mamalis v. Atlas Van Lines, Inc.,* 364 Pa.Super. 360, 528 A.2d 198, 200–01 (1987)).[16] With regard to either form of culpability, a release of the tortfeasor's liability may be effected in order to discharge a party's obligations to the injured party. The question then becomes: to whom does the release extend?

 At common law, two rules governed the release of parties in a case. First, the release of one joint tortfeasor released all other potentially liable parties. *Gunther v. Lee,* 45 Md. 60, 67 (1876). *See also Swigert v. Welk,* 213 Md. 613, 133 A.2d 428 (1957); *Loh v. Safeway Stores, Inc.,* 47 Md.App.

---

**16.** Often, Maryland courts look to Pennsylvania court decisions in regards to the UCATA, as that state enacted the same form of the Act as Maryland did. *See Chilcote,* 300 Md. 106, 476 A.2d 204, discussed in more detail, *infra.*

110, 422 A.2d 16 (1980). Second, the release of an agent automatically released the principal. The former rule was statutorily abrogated in Maryland in 1941 with the adoption of the UCATA. The latter rule remains unchanged.

The UCATA applies solely to joint tortfeasors, *i.e.*, more than one direct wrongdoer. As such, its provisions do not come into play unless the party released is a "joint tortfeasor" as contemplated by § 16 of the statute.[17] Enactment of the UCATA provided that a joint tortfeasor, who previously was released from liability upon the release of a co-tortfeasor, continued to be liable to the injured party, regardless of whether a release of a co-tortfeasor had been executed.[18] UCATA § 19; *Martinez v. Lopez*, 300 Md. 91, 102, 476 A.2d 197 (1984); *Loh v. Safeway Stores, Inc.*, 47 Md.App. at 118, 422 A.2d 16. Indeed, a co-tortfeasor remains liable unless specific language in the release states otherwise. Oftentimes, courts resort to the actual language of the release to determine a settling defendant's liability where it has not been determined by a trier of fact.[19] Accordingly, the issue becomes: what is the effect of a settling defendant's agreement to be classified as a "joint tortfeasor" on the nonsettling defendant?

---

**17.** *See* note 15, *supra*.

**18.** Protecting the inadvertent relinquishment of claims against other joint tortfeasors was one of the goals underlying § 19 of the UCATA.

**19.** In some instances, the settling parties specify in the release that the releasee is to be regarded as a joint tortfeasor, even though he may disclaim liability. *See, for example, Martinez v. Lopez*, 300 Md. 91, 94 [476 A.2d 197] (1984); *Jones v. Hurst*, 54 Md.App. 607 [459 A.2d 219] (1983). In that event, the releasee's status as a joint tortfeasor is contractually determined. Conversely, the settling parties may specify in the release that the releasee shall *not* be regarded as a joint tortfeasor unless adjudicated as such, in which event the releasee will be regarded as a mere volunteer absent a judicial determination of his liability. *Allgood v. Mueller*, 307 Md. 350 [513 A.2d 915] (1986). *Collier v. Eagle–Picher Indus., Inc.*, 86 Md.App. 38, 57, 585 A.2d 256, *cert. denied sub nom. Corhart Refractories Co. v. Collier*, 323 Md. 33, 591 A.2d 249 (1991).

It is axiomatic that the contractual agreement between a plaintiff and a co-defendant cannot serve to define the liability of another co-defendant not a party to the agreement. Appellant and Dr. Casas cannot simply agree that Dr. Casas will be deemed a "joint tortfeasor" and contemplate that the Health Department be taken as the party with whom Dr. Casas "joined" in acting tortiously, as the word "joint" necessarily implies the existence of two or more within § 16's definition.

■ Appellant alleges that the Health Department acted in the capacity of a joint tortfeasor. As an independent basis on which to find the Health Department liable, appellant now states that

complete examinations were not performed on Maria Rivera at the [Health Department] clinic *because necessary supplies, i.e. nitrazine paper, had been exhausted. When supplies were exhausted it was the policy of the clinic to send patients to the hospital.* While that procedure was followed in this case, it is alleged that the Department was negligent in failing to adequately supply the clinic and that this negligence contributed to the damages alleged. Dr. Casas had nothing to do with the shortage of supplies at the clinic. [Emphasis added.]

Appellant raises this argument for the first time on appeal. It was not raised in her Second Amended Complaint, on which the trial court ruled, or in any other pleading submitted to the court. We will not decide an issue "unless it plainly appears by the record to have been raised in or decided by the trial court...." Md. Rule 8–131(a). *See also State v. Hutchinson,* 287 Md. 198, 202, 411 A.2d 1035 (1980); *Adams v. Wilson,* 264 Md. 1, 11, 284 A.2d 434 (1971); *Young v. State,* 220 Md. 95, 98–99, 151 A.2d 140 (1959), *cert. denied,* 363 U.S. 853, 80 S.Ct. 1634, 4 L.Ed.2d 1735 (1960); *Passamichali v. State,* 81 Md. App. 731, 737, 569 A.2d 733 (1990), *cert. denied,* 319 Md. 484, 573 A.2d 808 (1990). This Court has stated, however, that whether to review an issue not raised and decided below is discretionary with the appellate court. *Booth v. State,* 62 Md.App. 26, 38, 488 A.2d 195 (1985), *aff'd,* 306 Md. 313, 508

A.2d 976 (1986). This discretion should be exercised in favor of review when the "unobjected to error [is] compelling, extraordinary, exceptional or fundamental...." *Smith v. State,* 64 Md.App. 625, 632, 498 A.2d 284 (1985) (quoting *Hutchinson,* 287 Md. at 203, 411 A.2d 1035 (bracketed material in original)) (both *Booth, supra,* and *Hutchinson, supra,* were plain error-instruction cases). It is clear that no such exceptional or compelling error presents itself in the case *sub judice* and, therefore, appellant's characterization of the Health Department as a joint tortfeasor, *i.e.,* directly negligent, cannot be premised on that which she presents for the first time on appeal.

▪ In regards to the vicarious nature of liability, the Court of Appeals has said that "where the liability of the master is vicarious, master and servant comprise but one 'pro rata share.'" *Chilcote,* 300 Md. at 114, 476 A.2d 204. *See Anne Arundel Medical Center v. Condon, supra.* Moreover, "the tortious act of [a] servant done in the course of his employment is ordinarily the legal act of the master, and in this sense, the employer is not free of 'fault.'" *Embrey v. Holly,* 293 Md. 128, 136, 442 A.2d 966 (1982). *See also Rowley v. Mayor of Baltimore,* 305 Md. 456, 505 A.2d 494 (1986).

It is settled law, and fundamental to the concept of vicarious liability under the doctrine of *respondeat superior,* that the tortious actor must be the servant or agent of the one sought to be held liable, that is, that a master-servant or principal-agent relationship must exist. Once this first step is established, then the plaintiff must show that the offending conduct occurred within the scope of the employment of the servant or under the express or implied authorization of the master.

*Cox v. Prince George's County,* 296 Md. 162, 165, 460 A.2d 1038 (1983). Thus, if a party produces any legally sufficient evidence to prove the existence of an agency or employment relationship, it becomes a question of fact that must be submitted to the fact finder. *Faya v. Almaraz,* 329 Md. 435, 460, 620 A.2d 327 (1993). In the case *sub judice,* appellant did not present below any manner in which the Health Depart-

ment directly acted tortiously, but rather only implicated its secondary liability as Dr. Casas's employer.

*Chilcote v. Von Der Ahe Van Lines,* 300 Md. 106, 476 A.2d 204 (1984), is instructive in reaching a determination as to the nature of the relationship between Dr. Casas and the Health Department and the effect of the release. In that case, the appellants were involved in a three-party vehicular collision. An employee of Von Der Ahe Van Lines was driving one vehicle owned by Von Der Ahe and another party was driving the third vehicle. A release of the third party prior to trial prompted an appeal based on the appropriate *pro rata* share of the employer's and employee's liability. The Court of Appeals analyzed the UCATA's legislative history and held, given the derivative nature of an employer's liability and the fact that it was not shown that the employer was "personally and directly guilty of any [tort] ... by reason of what she personally did or omitted to do," the employer and employee to have committed the same act of negligence, for which the appellants could only recover once. *Chilcote,* at 118, 476 A.2d 204 (citation omitted). *See also Anne Arundel Medical Center v. Condon, supra.*

Accordingly, the Health Department's Motion to Dismiss was properly granted.

## IV

 Appellant is also aggrieved by the trial court's grant of Dr. Soo Young Oh's Motion for Summary Judgment. She contends that Dr. Oh was negligent in the performance of his supervisory duties over the residents at the Prince George's County Hospital Center. Appellant further asserts that Dr. Oh's liability stems from his status as the Hospital residents' "special employer," within the meaning of the "borrowed servant rule." [20] In addition to denying liability, Dr. Oh

---

**20.** Her Second Amended Complaint alleges that "[a]s a result of Defendant Soo Young Oh's supervisory position over the hospital residents for the period of time relevant herein, Defendant Soo Young Oh is

challenges appellant's contentions on public policy grounds.[21]

We do not accept appellant's characterization of Dr. Oh's relationship *vis-à-vis* the residents. We explain.

A "borrowed servant" can create liability in a third party who is not his master for the servant's negligent acts, when that third party essentially "borrows" him from his actual master. Depending on the degree of control exercised by the third party over the servant and the degree of autonomy given to the servant, the third party may be liable for the other's servant's negligent acts as his "special employer." The Court of Appeals, in *Dippel v. Juliano*, 152 Md. 694, 699–700, 137 A. 514 (1927), held:

> Evidently full dominion and control is not necessary, for that would imply the right to hire and discharge, and that is nowhere regarded as essential, while the mere right to point out and direct the servant as to the details of the work and the manner of doing it, leaving to the servant or his general employer the right to determine what work he shall do and what means he shall employ to do it, ordinarily is not enough. *But where the work to be done is the borrower's work, and a part of his business, and he has the power and authority to direct when and where and how it shall be done, and where the work is not within the scope of the general employment of the servant, it may fairly be said that so far as that work is concerned he is under the control*

vicariously liable for the negligent acts or omissions of the hospital residents in that he acted at [sic] their 'special employer.' "

21. He states:

> To ... accept Appellants' argument in this appeal, ... would create the unreasonable and, quite candidly, dangerous, principle that every on-call physician (whether surgeon, obstetrician, ophthalmologist, cardiologist, etc.), can be held vicariously liable for the negligent acts of hospital employees providing medical care to a patient unknown to the on-call physician, who has no opportunity to evaluate the patient or participate in the care provided. Under such a principle of law, no reasonable physician would *ever* provide on-call medical services to any hospital, to the detriment of the community.

*of the borrower and that the latter will be responsible for his negligent acts.* [Emphasis added, citation omitted.]

Appellant alleges it is this "borrowed servant" relationship which creates derivative liability in Dr. Oh for the negligence of the residents who provided Ms. Rivera with medical care. We disagree. In the case *sub judice,* the work to be done was the Hospital's—the master of the attending residents. The work was part of the Hospital's business—providing medical services. Furthermore, the work done by the residents was within the scope of their relationship with the Hospital. *See also Baltimore Transit Co. v. State,* 184 Md. 250, 267–68, 40 A.2d 678 (1945). The residents were not being "borrowed" by Dr. Oh. If anything, Dr. Oh's services were being "borrowed" by the Hospital.

The question thus becomes what is the nature of the relationship between the Hospital, the residents, and Dr. Oh or, stated differently, what is the nature of an "on call" relationship in the hospital/doctor/patient context? We can find no agreement in the record defining the specific relationship in the case *sub judice.* There is also no evidence regarding the duties and responsibilities encompassed by being "on call." [22]

In the case *sub judice,* no evidence regarding Dr. Oh's ability to control the residents prior to being called was presented. Moreover, evidence was adduced that, in respect to his "on call" status, Dr. Oh was an independent contractor and, as such, not an employee in the strict sense of the word. In his capacity as an independent contractor of the Hospital, Dr. Oh was "on call" for a two week period each year. His responsibilities while "on call" included consulting with the residents *when they sought his assistance.* In the absence of an express agreement, "on call" means nothing more than that. He did not exercise control over their actions on a

---

**22.** At one point when being deposed as to his "on call" relationship, Dr. Oh noted that he was to supervise the residents. In the context of the answer, he was responding as to his duties as an "on call" doctor, *i.e.,* when he was called upon for assistance.

regular basis. Moreover, in our view, the relationship extant here cannot be construed as a supervisory situation whereby the resident's knowledge is imputed to Dr. Oh. He was merely to be consulted "regarding any complications that the residents encountered in caring for obstetrical patients" and, theoretically, in that two week period, had the residents not experienced any complications in their routine, Dr. Oh would not have any knowledge of who had and had not been treated and the manner in which they had been treated. Indeed, the morning of September 8, 1978 was the first time he was made aware of Ms. Rivera's condition. Following the child's delivery, he had no further contact with her or her mother in any capacity—nor was such contact required.

Appellant asserts on appeal and vigorously argued below that, because of Dr. Oh's status as an associate staff physician, he had a duty to train residents and supervise them at all times by reason of his agreement with the Hospital. The problem with appellant's position is that all Dr. Oh was required to do under his agreement and arrangement with the Hospital, at all times relevant to the case at bar, was to be "on call." When called upon, he then assumed his duties, *i.e.*, to consult with, advise, and attend the residents. The evidence is clear that he did just that when called. The damage, however, had already occurred to appellant by the time the residents contacted him.

The duties of "on call" physicians have not heretofore received significant appellate attention. There is only one case of which we are aware in Maryland where an "on call" doctor was found to have been negligent "in his response to a call." We shall address that case later. One state, North Carolina, has addressed the issue in at least one case in both the intermediate appellate court and the Supreme Court of that State. Both courts adopted a broad definition of the duties and liabilities of physicians "on call" (albeit for different reasons). We find, however, the logic of the dissents in those cases to be more persuasive. We explain.

The North Carolina Court of Appeals, in *Mozingo v. Pitt County Memorial Hospital, Inc.*, 101 N.C.App. 578, 400 S.E.2d 747 (1991) (cited by appellant), was concerned with both the common law duty of care and a North Carolina statutory standard of care in reviewing a summary judgment in favor of a doctor whose "on call" duties were created by contract. Relying on the statutory standard of care, the court reversed and remanded to the trial court for a determination in reference to that standard, saying: "A duty to meet the statutory standard of care may arise absent a consensual physician-patient relationship." As to the common law standard of care, however, it noted:

> Eastern [a physicians group contracting to provide services to the hospital] agreed to provided its own physicians for "on call" supervision of the residents training under the residency program.[23] The contract stated that Eastern's employee-physicians could provide supervision by remaining at home during "on call" hours so long as the physicians were immediately available by telephone to respond to the chief resident's requests for assistance....
>
> ... While the defendant [doctor] had unrestricted privileges ... as a "staff physician," he was not employed by either the Hospital or the Medical School....
>
> After coming "on call," the defendant remained at his home with an open telephone line.... Upon receiving the call, the defendant immediately went to the Hospital. However, by the time he arrived, Mozingo had completed her delivery. The defendant's first contact of any kind with Mozingo and the plaintiffs occurred after the delivery....
>
> ....
>
> ... [T]he defendant never accepted Mozingo or Mozingo, Jr., as patients or undertook to treat them.... [T]he only contact they had took place *after* any negligence was alleged to have occurred.... [T]he defendant has shown ... that an essential element of the plaintiffs' claim does not exist,

---

**23.** The hospital was a "teaching" hospital.

thereby shifting the burden to the plaintiffs to come forward with evidence....

*Id.* 400 S.E.2d at 748–51. The dissenter attacked the majority's holding that there was a dispute of material fact as to whether the North Carolina *statutory* duty of care had been breached,[24] in what appears to us to be a better reasoned opinion:

[M]y review of the evidence ... indicates that the defendant did not owe Mozingo, Jr. a duty of care in the absence of a physician-patient relationship. Without establishing a duty of care, there can be no negligence....

. . . .

The undisputed evidence ... establishes that defendant ... met all of his contractual obligations to provide supervision.... Defendant began his "on call" supervision ... on 5 December 1984. He remained at home (as he was permitted to do under the contract) with an open telephone line. Immediately upon receiving the request for assistance ... defendant went to the hospital to assist the resident.... By the time he arrived, the baby had been delivered.

. . . .

... We find no evidence that defendant in any way breached his contract for providing on call services on 5 December 1984, or acted or failed to act in a manner which would establish a duty of care under the facts of this case.

*Id.* at 754–55.

In the North Carolina Supreme Court's review of *Mozingo v. Pitt County Memorial Hosp., Inc.,* 331 N.C. 182, 415 S.E.2d 341 (1992), the court noted that

the protocol of their respective medical schools [Bowman–Gray School of Medicine, North Carolina School of Medicine, Duke University School of Medicine] "permitted the Attending On Call physicians to afford coverage during the hours of their assignment by either being present in the

---

**24.** Appellant alleges a common law duty of care was breached in this case.

hospital or, unless a problem is specifically anticipated, by being present at their residence or other specified place and immediately available to a telephone so as to come immediately to the hospital upon request."

*Id.* 415 S.E.2d at 343. However, the plaintiffs presented an expert witness who testified that "an on-call supervising physician should call in periodically during his coverage shift," *id.* at 343, and that the doctor had a

"responsibility, when he came *on call*, to find out what obstetrical patients had been admitted to the hospital, their condition and to formulate a plan of management.... [A] supervising physician needs to make contact ..., preferably at the beginning, and maybe a few times in between, as to what is occurring on his service."

*Id.* That court, relying on a stipulation by the doctor that he had "responsibility for supervision of the OB/GYN residents and interns at the time of the birth," said:

Based on this stipulation *and* the uncontested fact that Dr. Kazior knew the residents at the Hospital were actually treating patients when he undertook the duty to supervise the residents as an on-call supervising physician, we conclude that he owed the patients—including Mozingo, Jr.—a duty of reasonable care in supervising the residents....

. . . .

... Thus, in the increasingly complex modern delivery of health care, a physician who undertakes to provide on-call supervision of residents actually treating a patient may be held accountable to that patient, if the physician negligently supervises those residents and such negligent supervision proximately causes the patient's injuries.

. . . .

... Here ... the defendant has stipulated that he undertook the duty of on-call supervision of—not merely consultation with—the resident physicians....

*Id.* at 344–46 (emphasis added). There was, at the North Carolina Supreme Court level, what we also perceive to be a better reasoned dissent by Judge Meyer, who noted:

Dr. Kazior did not at any time examine, treat, care for, or in any other manner act as [a] physician . . . prior to or during the birth. . . . Prior to the telephone call . . . Dr. Kazior received no request for assistance of any kind. . . . Upon being notified . . . Dr. Kazior immediately went to the hospital . . . only to find that the delivery was completed. . . . [T]here is no claim that anything he did after the event . . . has caused any injury or damage to any plaintiff.
. . . .

Until today, it has been fairly well settled that absent a physician-patient relationship or vicarious liability based on the negligence of a servant, a physician is liable for his negligence to the same extent as any other individual—a physician is liable in tort when he undertakes responsibility to do some act and negligently performs the act thereby causing injury. . . . To my knowledge, no court in the country has heretofore held a private physician liable for injuries suffered by an individual whom he has never treated, never met, and never agreed to treat based on that physician's compliance with a contract to provide consultation to and limited on-call supervision of a hospital's resident physician. . . .

. . . The evidence . . . establishes that the residents . . . were "agent[s], servant[s] or employee[s] of . . . Pitt County Memorial Hospital, Inc." Nothing in the record suggests that the residents were employed by or were servants of Dr. Kazior, and thus no liability may be vicariously imputed to Dr. Kazior. . . .

. . . .

. . . Dr. Kazior did not have a duty of *general* supervision of the residents. . . . Dr. Kazior merely assumed responsibility to provide limited supervision . . . to remain at home when he was assigned on-call supervision and to make himself available by telephone for advice and assistance. . . . The majority places great importance on a stipulation . . . but fails to interpret in connection with . . . the limited nature of Dr. Kazior's duties under his employer's contract.

*Id.* at 347–49. The dissenter then pointed out, we believe correctly, that none of the cases cited by the majority involved "on call" physicians' limited assumption of duties, citing *Maxwell v. Cole*, 126 Misc.2d 597, 482 N.Y.S.2d 1000 (Sup.Ct.1984) (liability of hospital's chief of service); *Moeller v. Hauser*, 237 Minn. 368, 54 N.W.2d 639 (1952); *McCullough v. Hutzel Hosp.*, 88 Mich.App. 235, 276 N.W.2d 569 (1979) (assigned attending physicians). He opined that the doctor had not breached his duty, *i.e.*, he was at home two miles from the hospital, remained there available for telephone calls, and immediately went to the hospital when called. The dissenter then concluded:

> The majority's bold extension of tort liability to on-call physicians ..., will, in my opinion, chill the willingness of experienced medical practitioners to serve in that capacity. If that proves to be the case, the impact of the majority opinion will fall not upon those who have personal attending physicians, but upon those who cannot afford them.

*Id.* 415 S.E.2d at 350.

There had been a prior North Carolina case in respect to indirect negligence, but the doctor in that case, though "on call," had arrived and was present and attending during a medical emergency involving multiple patients during the time in which it was alleged the negligence occurred. In *Easter v. Lexington Memorial Hosp., Inc.*, 303 N.C. 303, 278 S.E.2d 253 (1981), the Court reversed the grant of summary judgment in favor of the "on call" physician, Dr. Cline, based upon its belief that there was a dispute as to whether Dr. Cline had entered into a physician-patient relationship. Dr. Cline was the physician actively in charge of the emergency room of the hospital and was present when Easter, a burn victim, was brought in along with several other victims of a fire. There was some evidence that Easter was initially "seen" by Dr. Cline. However, an obstetrician-gynecologist volunteered to treat the victim and allegedly did so improperly and the victim ultimately died. The issue in the case related to Dr. Cline's liability. The court first noted: "It is well settled that the relationship of physician to patient must be established as a prerequisite to

an actionable claim for medical malpractice." *Id.* 278 S.E.2d at 255. The court additionally noted that there also was evidence that Dr. Cline may have seen the victim and that Dr. Cline had assigned the patient to the obstetrician-gynecologist. The court, in reviewing the summary judgment held:

> [T]he evidence raises issues of material fact as to the negligence of Dr. Cline in assigning or *permitting an obstetrician-gynecologist arguably untrained in the area of major burns,* to treat an emergency burn patient....

*Id.* at 256 (emphasis added). *See also Willoughby v. Wilkins,* 65 N.C.App. 626, 310 S.E.2d 90 (1983), *cert. denied,* 310 N.C. 631, 315 S.E.2d 697 (1984).

We note that the North Carolina decisions have been the subject of some criticism within that state. *See* 28 Wake Forest L.Rev. 747, 773–74 (1993):

> *Mozingo* can be seen as an extension of the judicial efforts to hold all potential wrongdoers liable for a single event of medical malpractice.... [I]ndependent contractors can now be held liable for failure to perform tasks not voluntarily assumed under a contract as long as those tasks arguably further the purpose of the contract.... Thus, insurers may be hesitant to cover contracting individuals when the potential liability is defined by a court of law rather than the contract....
>
> The most startling result of *Mozingo* is the independent contractor's inability to define the scope of his liability within the terms of his contract with the hospital.... Dr. Kazior was found to be potentially liable for negligent failure to perform tasks not assumed under the "on call" agreement.... [N]o party contracting with a hospital ... may ever define the scope of potential liability....
>
> ... [T]he dissent correctly argued that the appropriate party to a suit based on inadequate supervision of residents is the hospital, not an independent contractor who contractually assumes only part of the supervisory duties. [Footnotes omitted.]

Several other states have addressed the matter of the liability of doctors who have not rendered advice or afforded treatment, either because they were not called or because they had no opportunity to do so.

In *Roberts v. Hunter*, 426 S.E.2d 797 (S.C.1993), Hunter, an examining room physician, contacted Dr. Hayes, a neurologist, to examine an accident victim. Dr. Hayes, who was then treating other patients, agreed to examine Roberts, but, before he arrived fifteen or twenty minutes later at the examining room, Roberts left. Roberts returned two and one-half hours later, paralyzed on his right side. Dr. Hayes received a directed verdict from the court and a jury rendered verdicts for the other defendants. The issue on appeal was the appropriateness of the grant of a directed verdict in favor of Dr. Hayes. Roberts claimed that a patient/doctor relationship existed such that Dr. Hayes had a duty to come to the emergency room immediately, and his failure to do so constituted negligence. The Court recognized that the establishment of a physician-patient relationship was a prerequisite to a claim of medical malpractice. It stated:

> The issue of whether a doctor/patient relationship may exist when the patient has not been examined or treated by the doctor is novel to this Court. However, under facts similar to those here, other jurisdictions have concluded that the relationship was not established.

*Id.* at 799. It then held:

> [I]t is undisputed that Dr. Hayes neither examined Roberts nor reviewed his file. An examination was made impossible by Roberts' departure from the hospital. Based upon these circumstances, we hold that no doctor/patient relationship existed. . . .

*Id.*

The Court in *Fought v. Solce*, 821 S.W.2d 218 (Tex.App.— Houston [1st Dist.] 1991) framed the issue before it as: "Can a telephone call between two doctors create a patient-physician relationship between one of the doctors and a person whom the doctor does not know, has not spoken with, and has not

treated?" *Id.* at 218. Solce was an "on call" orthopedic specialist when Fought was brought to a Houston hospital emergency room for treatment of various fractures. The emergency room physician called Solce twice to discuss the patient's treatment. Solce was then asked to come to the hospital to examine Fought but declined to do so. The issue presented was whether Solce had a duty to render services to Fought and, if so, whether the duty had been breached.

The court noted that there is no common law duty to an injured party absent a physician/patient relationship and, as a result, no such relationship existed in the case. The court further held that the fact that Solce volunteered to be "on call" does not in itself impose any duty. Fought cited the Texas "patient dumping" statute as authority for imposing a duty of care for negligence on *Solce.* The Texas court rejected that theory, stating that the statute's purpose was to prevent patient dumping, not to create new private causes of action in negligent malpractice, opining at 221: "We do not believe that it is the intent of our legislature that, by merely placing a telephone call to a doctor's home, one can impose a civil duty on that doctor to go to a hospital and give medical treatment to an individual whom he did not know." *See also Bird v. W.C.W.,* 868 S.W.2d 767, 771 (Tex.1994), where a psychologist was found to have no duty of care to a patient's father in the absence of a patient/physician relationship between the father and the psychologist's mental health clinic (the father was named as the child's abuser).

In *Lopez v. Aziz,* 852 S.W.2d 303 (Tex.App.—San Antonio 1993), the patient alleged that the treating physician had consulted by telephone with Dr. Aziz and that Dr. Aziz failed to recommend treatment. She alleged that the consultation was with her consent and, thus, a physician/patient relationship had arisen. There was no evidence of any "on call" status; rather, Dr. Aziz voluntarily gave advice to the treating physician. The court noted: "To expose physicians such as Dr. Aziz to liability for simply conferring with a colleague would be detrimental in the long run to those seeking compe-

tent medical attention and is contrary to the public policy of this state." 852 S.W.2d at 307.

Two cases, one from an intermediate appellate court in Texas and the other from Arizona, when considered together, present examples of when an "on call" physician should be held liable and when he should not be held liable. The "on call" physician was found liable in the Texas case of *Wheeler v. Yettie Kersting Memorial Hosp.*, 866 S.W.2d 32 (Tex.App.—Houston [1st Dist.] 1993). A woman with labor complications was brought to the hospital. Her symptoms were communicated to the "on call" doctor who subsequently approved a transfer to another hospital ninety miles away. En route, labor began. It was a breach birth, and the baby died. There was evidence that, prior to approving such a transfer, the "on call" doctor should have obtained the history of the present pregnancy and earlier ones, the history of prior and present labor and delivery complications, information as to fetal well-being, the presenting part and position of the fetus, dilation and other information—most, if not all, of which he did not obtain. The Court identified the question before it as: "whether Dr. Rodriguez actually rendered services to Mrs. Wheeler, thus establishing a physician/patient relationship." *Id.* at 39.

> Dr. Rodriguez was not asked nor did he refuse to come in to examine the patient. Instead, he was asked to evaluate certain information and make a medical decision.... [H]e willingly agreed to do so. We conclude that in evaluating the status of Mrs. Wheeler's labor and giving his approval, he established a doctor-patient relationship ... and accepted the duties which flow from such a relationship.

*Id.* at 39–40.

An "on call" physician was not held liable in *Thompson v. Sun City Community Hosp., Inc.*, 141 Ariz. 597, 688 P.2d 605 (1984), where a hospital (Boswell) made a decision to transfer the patient to another hospital. A vascular surgeon was "on call" to come to the hospital and treat patients who needed specialized attention—but he was not called in by the hospital.

The plaintiff argued that the vascular surgeon had breached his duty in failing to attend the patient and was liable under the case of *Hiser v. Randolph,* 126 Ariz. 608, 617 P.2d 774 (1980). The Court noted a distinction in the *Hiser* case—a distinction shared in the case *sub judice.*

In *Hiser* the hospital did not have a physician on duty in the emergency room. Several local physicians were "on call" to come to the emergency room to render emergency care. By assenting to ... bylaws, rules and regulations these physicians "personally became bound" to come ... when called. The doctor in *Hiser* was called ... *and flatly refused to fulfill his obligations.*

In the case at bench, physicians were on duty and present ... to care for emergency patients; specialists were "on call," prepared to come to the hospital and treat patients.... Unlike the hospital in *Hiser,* Boswell [the name of the hospital operated by Sun City] did not request this physician to come. To the contrary, Boswell's refusal to admit Jessie would have made Dr. Hillegas' arrival at the hospital an empty gesture.

*Id.* at 613, 617 P.2d 774 (emphasis added).

We believe the better reasoned rule is that announced in the dissents by the Court of Appeals and the Supreme Court of North Carolina in *Mozingo,* 101 N.C.App. 578, 400 S.E.2d 747 (1991), and 331 N.C. 182, 415 S.E.2d 341 (1992), respectively, and the decisions in *Roberts v. Hunter, supra,* and *Thompson v. Sun City, supra.* The cases of *Wheeler v. Yettie Kersting, supra; Lopez v. Aziz, supra; Fought v. Solce, supra; Bird v. W.C.W., supra,* are not in direct conflict with those cases. We shall therefore not follow the lead of the North Carolina courts.

We have previously stated the facts of the present case involving Dr. Oh, *i.e.,* when called, he immediately responded but the damage had already occurred. *Thomas v. Corso,* 265 Md. 84, 88, 288 A.2d 379 (1972), offers a contrasting factual situation indicative of the duties of an "on call" doctor when called. It is an example of a situation in which liability can

attach. Its factual situation is, however, inapposite to the facts of the case at bar.

In *Thomas,* Dr. Thomas was an "on call" physician. Corso was brought to a hospital emergency room for treatment of serious injuries he had suffered as a result of a vehicular collision. Dr. Thomas was called at 11:25 p.m. by the emergency room's registered nurse, who advised him of the apparent nature of Corso's injuries. Dr. Thomas instructed the nurse to admit Corso and advised her of the treatment to be administered.

The Hospital at issue employed no residents or interns. All medical services were administered by a staff of private physicians through the use of an "on-call roster." Under the agreements there in effect, when physician services were deemed needed in the emergency room, the nurses informed the "on call" physician of the patient's vital signs and the "on call" physician then had the duty of diagnosing the patient's condition, prescribing treatment, and determining the necessity of admission. Under the practice at this hospital, an "on call" physician was the only physician with responsibility for the patients.

Corso died several hours after being admitted to the hospital. He was pronounced dead at 2:30 a.m. by Dr. Thomas upon his arrival, after having been summonsed at 11:25 p.m. the previous day.

Dr. Thomas's agreement with the Hospital required him to be available "on short notice" during the twenty-four hour "on call" period to handle emergency room situations. When the nurse called, he was home, asleep. His home was ten minutes from the hospital. He remained there until he was called again at 2:00 a.m. and notified that Corso was dying. Corso had been, at Dr. Thomas's direction, admitted as his patient. There was expert testimony to the effect that other, more extensive, treatment and the immediate attention of a physician should have been available from the time of Corso's admission.

The Court quoted from 1 Louisell and Williams, *Medical Malpractice* § 8.05 pp. 206–07, and noted at 98:

"The duty to attend the patient *after a physician-patient relationship* has been established is a clearly defined specific duty within the general duty of due care. . . . *It requires no expert evidence, however, to show that failure altogether to attend a patient, when common sense indicates that without attention the consequences may be serious, is not reasonable care.*" [Emphasis added.]

Before rendering its holding, the Court noted:

It should also be kept in mind that there was no reason why Dr. Thomas could not have gone to see and examine Corso who was only 10 minutes away. Dr. Thomas was not engaged in seeing another patient. He was at home and, indeed, came to the Hospital in quick order after being notified that Corso was *in extremis*, arriving after he had died.

265 Md. at 101, 288 A.2d 379. It then held that a jury could have found that there existed a "substantial possibility of survival which was destroyed by the failure of Dr. Thomas to examine, diagnose and treat Corso at any time after Corso arrived . . . *and was accepted by Dr. Thomas as his patient.*" *Id.* at 102, 288 A.2d 379 (emphasis added).

All that which Dr. Thomas failed to do, Dr. Oh did in the case *sub judice*. He remained "on call" and, so far as the record reflects, responded promptly to the call when it was made. By the time of his arrival, however, the alleged negligent acts had already occurred. They had apparently been occurring over the few days prior to his being first called, during which time Ms. Rivera had sought treatment on several occasions both at the Hospital and at the clinic operated by the Health Department. He had no opportunity to examine the patient, review the patient's file, or in any way contact her (and, through her, the unborn child) prior to the alleged negligent acts. Thus, no patient/physician relationship existed at the time the acts of others, allegedly constituting negligence, resulted in appellant's injuries.

Additionally, Dr. Oh makes what is a public policy argument in his brief. *See* our note 23, *supra.* It would appear that the use of "on call" physicians may be the source of significant consultation and treatment services for many Maryland citizens, consultation and treatment that might not otherwise be available to them at all—or only available at greatly increased costs to the patients—if these medical services had to be maintained on site on a twenty-four hour basis. To hold that an "on call" physician can, under the circumstances of this case, be liable for the negligence of others that occurs prior to the "on call" physician being summonsed would make the "on call" physician potentially liable twenty-four hours a day. We agree with appellee that such a situation may well cause a reluctance on the part of physicians generally to agree to being "on call." Thus, the assistance of such physicians (most of whom apparently have much more experience than the interns and hospital residents) would be lost to the medical treatment system.

In our view, imposing liability on an "on call" doctor under the circumstances of this case would affect most severely those citizens who are not in such an economic status that they could afford, or would be likely to have, a personal specialist or physician in attendance. The quality of medical care for the less economically fortunate, given the importance of emergency room treatment to them, might well be disproportionately adversely affected.

In reviewing the grant of a summary judgment motion, we are concerned with whether a dispute of material fact exists. *Arnold Developer, Inc. v. Collins,* 318 Md. 259, 262, 567 A.2d 949 (1990); *Bachmann v. Glazer & Glazer, Inc.,* 316 Md. 405, 408, 559 A.2d 365 (1989); *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985); *Markey v. Wolf,* 92 Md.App. 137, 170, 607 A.2d 82 (1992). "A material fact is a fact the resolution of which will somehow affect the outcome of the case." *King,* 303 Md. at 111, 492 A.2d 608 (citing *Lynx, Inc. v. Ordnance Prods., Inc.,* 273 Md. 1, 8, 327 A.2d 502 (1974)). "A dispute as to a fact 'relating to grounds upon which the decision is not rested is not a dispute with respect to a *material* fact and such

dispute does not prevent the entry of summary judgment.'" *Seaboard Surety Co. v. Richard F. Kline, Inc.,* 91 Md.App. 236, 242–43, 603 A.2d 1357 (1992) (quoting *Salisbury Beauty Schools v. State Board of Cosmetologists,* 268 Md. 32, 40, 300 A.2d 367 (1973)). We further opined that, in order for there to be disputed facts sufficient to render summary judgment inappropriate, "there must be evidence on which the jury could reasonably find for the plaintiff." *Seaboard,* 91 Md.App. at 244, 603 A.2d 1357.

The Court of Appeals has also recently stated that "the proper standard for reviewing the granting of a summary judgment motion should be whether the trial court was legally correct." *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 592, 578 A.2d 1202 (1990) (citations omitted). The trial court, in accordance with Maryland Rule 2–501(e), shall render summary judgment forthwith if the motion and response show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. The purpose of the summary judgment procedure is not to try the case or to decide the factual disputes, but to decide whether there is an issue of fact that is sufficiently material to be tried. *See Coffey v. Derby Steel Co.,* 291 Md. 241, 247, 434 A.2d 564 (1981); *Berkey v. Delia,* 287 Md. 302, 304, 413 A.2d 170 (1980). Thus, once the moving party has provided the court with sufficient grounds for summary judgment,

> [i]t is ... incumbent upon the other party to demonstrate that there is indeed a genuine dispute as to a material fact. He does this *by producing factual assertions, under oath,* based on the personal knowledge of the one swearing out an affidavit, giving a deposition, or answering interrogatories. "Bald, unsupported statements or conclusions of law are insufficient."

*Lowman v. Consolidated Rail Corp.,* 68 Md.App. 64, 70, 509 A.2d 1239, *cert. denied,* 307 Md. 406, 514 A.2d 24 (1986) (citation omitted, emphasis added).

We hold that, unless the "on call" agreement between a hospital and a physician provides otherwise, an "on call" physician who has not accepted a patient or has not, pursuant to his "on call" status, consulted with a treating or attending physician in regards to the patient, or has not been summonsed pursuant to his "on call" agreement to consult with an attending physician or attend or treat a patient, is not liable for the negligence of others occurring during the "on call" but unsummonsed period. Were we to hold otherwise, we would be imposing the threat of liability on every physician for *all* patients that are treated at the Hospital during the time they are "on call." We affirm.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.